794 So.2d 1049 (2001)
Michael ADAMS a/k/a Michael Murry Adams, Appellant
v.
STATE of Mississippi, Appellee.
No. 2000-KA-00242-COA.
Court of Appeals of Mississippi.
April 24, 2001.
Rehearing Denied June 26, 2001.
Certiorari Denied September 6, 2001.
*1052 David L. Walker, Southaven, for Appellant.
Office of the Attorney General by Billy L. Gore, for Appellee.
Before SOUTHWICK, P.J., CHANDLER, and MYERS, JJ.
MYERS, J., for the Court:
¶ 1. Michael Adams was convicted in the Circuit Court of Lafayette County, the Honorable Henry L. Lackey presiding, of sexual battery in violation of Miss.Code Ann. § 97-3-95. He was sentenced according to the Miss.Code Ann. § 99-19-83 habitual offender statute to serve a term of life imprisonment without the benefit of probation or parole in the custody of the Mississippi Department of Corrections. Adams' motion for a judgment notwithstanding the verdict or in the alternative a new trial was denied. Feeling aggrieved of his conviction he appeals with eleven issues.
1. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S *1053 MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE BURGLARY OF THE HOME OF JENNIFER K. GINGERY COOK;
2. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S OBJECTION TO JOSEPH WARREN TESTIFYING AS TO THE TEST RESULTS PERFORM BY MRS. PANAID;
3. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS A SEARCH CONDUCTED PURSUANT TO A WARRANT;
4. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS SEARCH OF THE APPELLANT AND SEIZURE OF HIS BLOOD, SALIVA, HAIR, AND BODY FLUID SAMPLES BASED UPON THE ILLEGAL ARREST OF THE APPELLANT;
5. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO EXCLUDE THE TESTIMONY OF CAPT. MORGAN CONCERNING THE PARTIAL FOOTPRINT IMPRESSION FOUND ON THE GREEN DOOR AND THE BOOTS SEIZED FROM THE APPELLANT;
6. THAT THE VERDICT OF THE JURY IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE;
7. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANTS PEREMPTORY INSTRUCTION (D-1);
8. WHETHER THE TRIAL COURT ERRED IN ACCEPTING JOSEPH WARREN AS AN EXPERT WITNESS;
9. WHETHER THE CUMULATIVE ERRORS OF THE TRIAL COURT DENIED THE APPELLANT A FUNDAMENTALLY FAIR TRIAL AND DUE PROCESS OF THE LAW AS PROVIDED BY THE STATE AND FEDERAL CONSTITUTIONS;
10. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR A NEW TRIAL; AND
11. WHETHER THE SENTENCE OF THE COURT IS CRUEL AND UNUSUAL PUNISHMENT.
Finding no merit in his claims, we affirm his conviction and sentence.

FACTS
¶ 2. On January 26, 1999, S.C. was attacked in her bedroom by an intruder who leapt out of her closet. He put a towel over her face and sexually assaulted her. She never saw his face, only part of his arm which she described as almost hairless and part of his clothing which she described as a royal, darkish blue work uniform. She noted that her assailant did not have any real accent. and she thought his height was around five feet and eleven inches. She was unable to identify him in a photo lineup. She was able to narrow her identifications down to two people based on sound of voice and skin texture. Adams was one of these men.
¶ 3. In the investigation of S.C.'s attack, a hair from a black person was found in the bed, a partial footprint was found under the knob on the back door and paint and wood chips from the door.
¶ 4. On January 25th, the day before S.C. was attacked, a strange man leapt out of Jennifer Cook's bedroom closet. She stood face to face with him and screamed loudly and repeatedly. The intruder *1054 knocked the telephone out of Cook's hand, covered her face with his hand and knocked her to the floor. He escaped, and Cook continued to scream. In her bedroom, her previously partially opened window was completely open with the screen knocked out. Cook lived four doors down from S.C. Cook was able to fully identify Michael Adams as the perpetrator. At the time of trial, Adams had been indicted but not tried for the burglary of Jennifer Cook.
¶ 5. On January 24th, Officer Chad Redditt observed a black male running through a parking lot in the same area as the two attacks. The man said he was running up Jackson Avenue because someone was chasing him and because he did not know who it was, he was not sure if he was the target of a robbery. Officer Redditt identified Adams as that black male. He testified that Adams was dressed in a dark blue jeans and a blue jean jacket or shirt. Around the same time, another officer responded to a call from a Jackson Avenue area resident saying there was an unidentified prowler around his home and that the prowler had run away.
¶ 6. Two days after S.C.'s attack, on January 28th, Michael Adams was arrested and formally charged with the burglary of Jennifer Cook's home. He was identified by Cook both in a photographic and physical lineup. Capt. Morgan of the Oxford police was heading the investigations and noticed that Adams had on boots with a similar tread to the mark left on S.C.'s back door. He took the boots. While physical evidence had been gathered in the S.C. case, no DNA testing had been performed. On January 29th, Judge Lackey signed an order for Adams to submit hair, blood and saliva samples for testing. Then an arrest warrant for the sexual assault was secured on Feb. 1st.
¶ 7. At trial Adams was identified by Jennifer Cook as the perpetrator of the crime in her home. In addition to his motion in limine to exclude her identification, he objected to Cook's testimony. Joseph Warren was tendered and accepted as an expert. Adams objected to his testimony because Warren did not conduct the DNA testing himself. Capt. Morgan of the Oxford Police Department gave testimony on the identity of a boot print left on the victim's door. Adams objected to his testimony and the search leading up to it. The jury convicted him of the sexual battery of S.C.
¶ 8. To limit the possible endless debate on the issues presented, many have been combined for their discussion. In addition, issues 1-5 and issue 8 are evidentiary matters. In an effort to keep from being overly repetitive, the following standards will apply specifically to those issues while not excluding the remaining issues.
The relevancy and admissibility of evidence are within the discretion of the trial court and reversal may be had only where that discretion has been abused. Smith v. State, 656 So.2d 95, 98 (Miss. 1995). The discretion of the trial judge must be exercised within the boundaries of the Mississippi Rules of Evidence. Id. Unless the trial judge so abused his discretion as to prejudice the accused's case, we will not reverse his ruling. Id.

Sumrall v. State, 758 So.2d 1091, 1094 (Miss.Ct.App.2000)(see also McGowan v. State, 706 So.2d 231, 243 (Miss.1997)).
¶ 9. In addition to case law, the Mississippi Rules of Evidence address the discretion of a trial judge. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." M.R.E. 103(a)

*1055 1. Denial of Appellant's Motion in Limine to exclude evidence of the Burglary of Jennifer Cook.
¶ 10. Adams argues that prior bad acts are not admissible under M.R.E. 404(b) because of the highly prejudicial nature of that kind of testimony acknowledged in M.R.E. 403.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....
M.R.E. 403
Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
M.R.E. 404(b)
¶ 11. Jennifer Cook testified to the events on the night of January 25th. She told the details of her attack and identified her assailant as Adams.
¶ 12. In each of these crimes, the burglary and the sexual attack, the perpetrator chose single women living by themselves. These women lived on the same street and only four doors away from each other. Their houses were broken into less than twenty-four hours apart. When these women entered their bedroom a man leapt out at them from the closet where he had been hiding. In the case of Jennifer Cook, Adams put his hand over her face and shoved her to the floor. She kept screaming and subsequently was just burglarized. She was able to get a good look at him.
¶ 13. Unfortunately, in the attack on S.C., which occurred one day after the attack on Cook, the intruder raped her twice. She never saw his face because as he sprang out of her closet, he covered her head with a towel.
¶ 14. In the recently decided case of Flowers v. State, 773 So.2d 309 (Miss. 2000), the Mississippi Supreme Court held that,
[w]here proof of other crimes or acts ... [are] offered into evidence pursuant to Rule 404(b), it is still subjected to the requirement that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. M.R.E 403. Rule 403 is the "ultimate filter through which all otherwise admissible evidence must pass." Bounds v. State, 688 So.2d 1362, 1371 (Miss.1997).
Id. at 318.
All testimony when questioned as prejudicial must be reviewed under the light of M.R.E. 403. Judge Lackey heard that debate during the hearing for defendant's motion in limine. He decided that the evidence was more probative than prejudicial. Defense counsel cross-examined Cook allowing for his attempt to impeach and discredit the testimony of the witness. "Rule 404(b) is not a blanket prohibition of evidence of other actions. Where the evidence might be relevant in another manner, ..., this Court has allowed it to be introduced." Flowers, 773 So.2d at 319 (citing Hums v. State, 616 So.2d 313, 321 (Miss.1993)).
¶ 15. The similarities in each of these incidences are outstanding. Cook's testimony shows that Adams had opportunity, preparation, knowledge and identity all under very similar circumstances. M.R.E. 404(b); Manning v. State, 726 So.2d 1152 (Miss.1998). Judge Lackey ruled that this testimony was not unfairly prejudicial. *1056 We agree and find that it was properly admitted. There is no merit in this claim.
3. & 4. Overruling of the Appellant's motion to suppress a search conducted pursuant to a warrant and motion to suppress search of the Appellant and seizure of his blood, saliva, hair and body fluid samples based upon the illegal arrest of the appellant.
¶ 16. Adams claims that the search warrant was not valid because there was no probable cause upon which to base the warrant. "Probable cause arises where a police officer has reasonable cause to believe a felony had been committed, and reasonable cause to believe that the person proposed to be arrested is the one who committed it, as determined by factual and practical consideration of everyday life." West v. State, 725 So.2d 872, 893 (Miss. 1998); Thomas v. State, 645 So.2d 1345, 1347 (Miss.1994); Lockett v. State, 517 So.2d 1317, 1327 (Miss.1987); see also Hall v. State, 455 So.2d 1303, 1304 (Miss.1984) (probable cause exists when facts and circumstances within an officer's knowledge, or of which he has reasonable trustworthy information, are sufficient within themselves to justify a man of average caution to believe a crime was committed and by a particular person).
¶ 17. Here the police were working with the identification of Adams by Cook. The attack on S.C., of which Cook was aware, occurred four doors down from Cook's own home. That same night Adams had been seen in the area prior to the attack. Adams claims that there is no similarity in the nature of the crimes involving Cook and S.C. However, the women live in the same neighborhood. Adams broke into their homes. He hid in the bedroom closets of each woman. He leapt out at the women when they came into the room. He merely had the misfortune of Cook who was already on the telephone, facing him and screaming. He did not have the time to attack Cook because she put up such a fight. S.C. was not as lucky. She was ambushed and then raped. The crimes are very consistent with one another. However, Adams did not have the time to complete his attack on Cook. Thus, he was merely charged with burglary.
¶ 18. There was another identification of Adams by one of the patrol officers as the man running through the parking lot in the same area and on the night prior to S.C.'s attack. At the same time there was a prowler report that came in the direction from which Adams was running. Adams told the officers that he was looking for White Oak Lane. Because Adams lived on White Oak Lane, it struck the officers as odd that he should be looking for it. A background check was completed on Adams and found out that he had been incarcerated on rape and home invasion charges and an affidavit relaying the same information was filed. Judge Lackey found all of this indirect evidence to be worthy of a search warrant. Adams was already in police custody the result of a lawful arrest. He was under investigation for one crime and suspected of another. There was sufficient evidence for Judge Lackey to sign a warrant to obtain hair, blood and saliva sample from Adams.
5. Denial of the Appellant's motion to exclude the testimony of Capt. Morgan concerning the partial footprint found and the boots seized from the appellant.
¶ 19. Upon investigation of the S.C. attack, a boot print was found under the door knob of S.C.'s back door. When Adams was arrested for the burglary of Cook's home, Capt. Morgan noticed that Adams was wearing boots with a tread similar to that of the print. Capt. Morgan testified that the treads were similar in appearance.
*1057 ¶ 20. Capt. Morgan was not tendered as an expert. He offered his lay opinion. A lay opinion must meet two criteria set out in M.R.E. 702. Capt Morgan's testimony was "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue." M.R.E. 702. He has sufficiently met these criteria. He was also a twelve year veteran as an investigator. As such, his job is to notice details. Adams' boot print was merely one of the details noticed and pieced together by Morgan. This issue is without merit.
2. & 8. Overruling of the Appellant's objection to Joseph Warren's testimony on the test results and overruling of objection to Joseph Warren being accepted as an expert witness.
¶ 21. Adams objects to Joseph Warren being accepted as an expert in the testing of Mitochondrial DNA as well as Warren's testimony regarding the results of the tests. Adams claims that since Warren did not perform the test, Adams is being denied his Sixth Amendment right to confrontation. Our state supreme court has held in Gray v. State, 728 So.2d 36, 56 (Miss.1998) that "[t]he relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." Gray citing McIlwain v. State, 700 So.2d 586, 590 (Miss.1997). "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." Logan v. State, 773 So.2d 338, 346-47 (Miss.2000)(quoting Sheffield v. Goodwin, 740 So.2d 854, 856 (Miss. 1999)).
¶ 22. Warren is eminently qualified as an expert in molecular biology. Beginning with his bachelor's degree in 1978, he has worked his way up to defending his thesis in the pursuit of his doctorate from the University of North Texas in Denton. Incidentally, the subject of his thesis was Mitochondrial Control Region. Warren has continuously worked in the field of molecular biology throughout his career. He is the Assistant Laboratory Director for Forensic Division at Reliagene Technologies in New Orleans, Louisiana. He has qualified forty or fifty times in the past 10 years as an expert in DNA testing as either a forensic biologist or a forensic DNA analyst. He has testified as an expert in at least four other states in addition to Mississippi.
¶ 23. Warren testified that he supervised "all aspects" of the laboratory technician's work on the samples submitted in this case. The claim that the State did not emit testimony that the protocol followed by Warren was generally accepted in the scientific community is unsupported. Warren testified that, not only were these the same procedures used by the F.B.I., but they were also generally accepted procedures in the scientific community.
¶ 24. Adams relies on Kettle v. State, 641 So.2d 746 (Miss.1994) which held that when a defendant raises a Sixth Amendment confrontation clause challenge to the custodian of records testifying and introducing drug analysis reports as business records, such an introduction is prohibited and the person who performed the tests must be produced. Id. at 750. Kettle does not apply in the case at hand because Warren supervised, witnessed and checked the tests performed by his technician. Warren is not so far removed from the process as to be reduced to the level of *1058 a records custodian. Finding no error by the trial court, we affirm.
7. Denial of the Appellant's peremptory instruction D-1.
¶ 25. Ordinarily, we review the record and the instruction, evaluate it with the evidence presented and reach our decision. Our standard of review is as follows:
The standard of review for peremptory instructions and directed verdicts are the same. `In passing upon a request for a peremptory instruction, all evidence introduced by the State is to be accepted as true, together with any reasonable inferences that can be drawn from that evidence, and if sufficient evidence to support a verdict of guilt exists, the motion for a directed verdict is to be overruled.' Brown v. State, 556 So.2d 338, 340 (Miss.1990)(citing Butler v. State, 544 So.2d 816 (Miss.1989)). `Furthermore, when the trial court has erred in refusing to grant the defendant's request for a peremptory instruction, then the case must be reversed and the defendant discharged.' Brown, 556 So.2d at 340. However, this Court recognizes that a defendant shall not be discharged short of a conclusion that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty. Id.

Wall v. State, 718 So.2d 1107, 1111 (Miss. 1998).
¶ 26. There is no record of what peremptory instruction D-1 expressed and therefore nothing to review. Even if D-1 had been provided, the evidence thus far presented when viewed in a light most favorable to the verdict would have allowed any reasonable, hypothetical juror to find beyond a reasonable doubt that Adams was guilty. Id.
6. & 10. Verdict against the overwhelming weight of the evidence and denial of the Appellant's motion for a new trial.
¶ 27. In White v. State, 761 So.2d 221, 224 (Miss.Ct.App.2000), this Court reiterated the difference between a motion for a new trial and a JNOV by focusing on the decision in McClain v. State 625 So.2d 774 (Miss.1993). "The standard for reviewing denial of a new trial goes to the weight of the evidence and the standard for reviewing the denial of a JNOV is whether or not the evidence was sufficient to warrant such a verdict and whether fair minded jurors could have arrived at the same verdict." White, 761 So.2d at 224 (¶ 10).
¶ 28. The standard of review for determining whether a jury verdict is against the overwhelming weight of the evidence is that the evidence supporting the verdict will be accepted as true unless it is found that the trial court abused its discretion by failing to grant a new trial. Crawford v. State, 754 So.2d 1211, 1222 (¶ 30) (Miss.2000)(citing Collier v. State, 711 So.2d 458, 461 (Miss.1998)). "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this court disturb it on appeal." Herring v. State, 691 So.2d 948, 957 (Miss.1997)(citing Benson v. State, 551 So.2d 188, 193 (Miss.1989)). If a claim of unconscionable injustice is raised then, "[i]n reviewing this claim, this Court must accept as true the evidence favorable to the State." Wetz v. State, 503 So.2d 803, 812 (Miss.1987).
¶ 29. Adams claims that because there was no eyewitness to his attack on S.C. and because she could not conclusively identify him, there was not enough evidence to convict him. Issues of fact are the domain of the jury. The jury weighs the credibility of each witness when considering conflicting testimony. Turner *1059 v. State, 726 So.2d 117, 125 (¶ 29)(Miss.1998); see also Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979)(holding that the question of witness credibility is one to be resolved by the jury). The jury heard the details of the attacks, testimony of officers placing Adams in the vicinity of the crimes, DNA evidence linking Adams to the rape, and the identification by one of Adams' victims. This evidence was sufficient to warrant the verdict and fairminded jurors could have arrived at the same verdict in the same context. This issue is without merit.
11. Cruel and unusual punishment
¶ 30. Michael Adams was found guilty of the violent crime committed against S.C. and was sentence to life without parole. He is of the opinion that this sentence is disproportionate to the crime he had been convicted of committing. However, "[s]entencing is generally within the sound discretion of the trial judge and the trial judge's decision will not be disturbed on appeal if the sentence is within the term provided by statute." Bell v. State, 769 So.2d 247, 251 (Miss.Ct.App.2000)(citing Davis v. State, 724 So.2d 342 (¶ 10)(Miss.1998)). If a sentence does not exceed the maximum period allowed by statute, it will not be disturbed on appeal. Stromas v. State, 618 So.2d 116, 122 (Miss.1993); Wallace v. State, 607 So.2d 1184, 1188 (Miss.1992). In Stromas a sentence of thirty years was given to the defendant. It was then doubled in light of the defendant's "subsequent offender" standing. He was convicted of selling "a small amount of cocaine," but was denied relief by the appellate court because, "this sentence was within the statutory guidelines, and because this State's legislature, as a matter of public policy, has called for stiff penalties for drug offender[s], Solem v. Helm[, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)], is not implicated in this case. Declaring a sentence in violation of the Eighth Amendment to the U.S. Constitution carries a heavy burden and only in rare cases should this Court make such a finding." Stromas, 618 So.2d at 123.
¶ 31. While this is not a drug case, our legislature has taken similar exception to violent crimes such as sexual battery. Their distaste is embodied in the following statute.
Every person convicted in this state of a felony who shall have been convicted twice previously or any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one year or more in any state and/or federal penal institution, whether in this state or elsewhere, and where any one of such felonies shall have been a crime of violence shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
Miss.Code Ann. § 99-19-83 (Rev.2000).
¶ 32. Adams has served time in Illinois for two counts of attempted sexual assault, attempted robbery, robbery, home invasion and burglary. Two of these offenses involve violence and all of these are felony crimes. One set of felony crimes was committed in late 1991 and the other set was committed in early 1992, i.e., "arising out of separate incidents at different times." Miss.Code Ann. § 99-19-83. He was sentenced to approximately six-year sentences for each crime, most of which ran concurrently. While Mr. Adams' good fortune in Cook County, Illinois allowed him to gain his freedom after one seven year stint in jail, it does not count as a single offense or a single term in jail under Mississippi law. [T]he Mississippi Supreme *1060 Court set forth a requirement that the trial judge justify any sentence that appears harsh or severe for the charge. Bell v. State, 769 So.2d 247, 252 (Miss.Ct.App.2000)(citing Davis v. State, 724 So.2d 342 (¶ 11) (Miss.1998)). Adams sentence of life imprisonment without possibility of parole is not harsh or severe based on his criminal history. His sentence is justified and mandated by statute. This assignment of error is without merit.
9. Cumulative errors
¶ 33. This claim is found to be without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY OF SEXUAL BATTERY AND SENTENCE AS A HABITUAL OFFENDER TO LIFE IMPRISONMENT WITHOUT BENEFIT OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., PAYNE, BRIDGES, THOMAS, LEE, IRVING and CHANDLER, JJ., concur.
SOUTHWICK, P.J., concurs with separate written opinion, joined by McMILLIN, C.J., PAYNE, THOMAS, IRVING, MYERS and CHANDLER, JJ.
SOUTHWICK, P.J., concurring.
¶ 35. This separate opinion is solely to address the novel issue of the introduction into evidence of the results of a mitochondrial DNA test on a hair sample. The majority has stated that this evidence was properly admitted because of the broad discretion of the trial judge to determine the relevance and admissibility of any evidence. That is a recognized evidentiary principle, but I do not find that this specific issue may be resolved in quite those terms.
¶ 36. The results of DNA tests have been admissible in Mississippi trials for several years. The difference here, as fully explained at trial, was that the DNA from which these test results were obtained is not the same as that which has been the subject of earlier case precedents. The propriety of allowing evidence of the results of mitochondrial DNA testing has not previously been addressed by a Mississippi state appellate court. What a test result on mitochondrial DNA "proves" is not the same as for the better known results of a test on what is called nuclear DNA. I agree that the evidence was properly admitted. However, in this case of first impression we should explain exactly what is involved in the determination that we make.
¶ 37. What has been approved when specific procedural safeguards are followed is the use of expert testimony about the results of testing of nuclear DNA. Polk v. State, 612 So.2d 381, 390 (Miss.1992). The results of "DNA testing" have received an aura of infallibility, perhaps in the public mind but also in the caselaw. This arises from the precision that is possible when the nuclear DNA from the sample acquired at a crime scene can be compared with that of a sample taken directly from the accused.
¶ 38. The details and distinctions of mitochondrial DNA testing were explained at a hearing prior to the presentation of this evidence to the jury. The State called as its witness Joseph Warren, the assistant laboratory director at the Forensic Division of Reliagene Technologies in New Orleans. He had worked with DNA testing since 1988. He had testified about the results of nuclear DNA tests about 50 times, though this was the first time to *1061 testify as to mitochondrial DNA. He was accepted as an expert regarding mitochondrial DNA testing and that is not contested here.
¶ 39. No nuclear DNA could be obtained from the hair found on the bed of the rape victim in this case. As Warren's testimony revealed, each human cell has only one complete set of nuclear DNA, found in the nucleus, but from 1,000 to 100,000 sets of mitochondrial DNA that are located throughout the cell body. Mitochondria are small energy-producing organelles that contain their own DNA molecule, entirely distinct from a cell's single nuclear DNA molecule. The nuclear DNA is unique for each individual and contains characteristics inherited from both parents. That means that similarities to both parents' nuclear DNA will appear in their child. Mitochondrial DNA, on the other hand, only contains genetic material inherited from the mother. Any similarities between the mitochondrial DNA of a father and his child would be insignificant and coincidental.
¶ 40. In addition, the uniqueness of nuclear DNA and the less distinctive character of mitochondrial DNA arise from their respective complexity. The expert testified that a cell's nuclear DNA consists of over three billion base pairs of the building blocks that form DNA, while there are only 16,569 base pairs in mitochondrial DNA.
¶ 41. The expert appeared to say that human tissue or blood is needed for nuclear DNA to be tested. An examination of hair that does not have attached scalp tissue or of completely dry bones would only find mitochondrial DNA.
¶ 42. The expert testified to the advantages and disadvantages of mitochondrial DNA. Among the advantages are that it is much more readily found in a sample and is especially useful in identifying long-buried remains of individuals for whom no nuclear DNA would exist. One of the most-renowned uses mentioned by the expert was in identifying the remains of Russian Czar Nicholas II and his wife Alexandra, three of their five children, and four others, all of whom were executed by the Bolsheviks in 1918 and then buried in a secret place where they remained until 1989. The bones uncovered after seventy years had no nuclear DNA, but there was mitochondrial DNA that led to an identification.
¶ 43. What actually an "identification" means is one of the disadvantages explained by the expert. A mother will give all her sons and daughters the same mitochondrial DNA as she has; those daughters' children will also have the same mitochondrial DNA, as will the children of granddaughters, and continuing in the maternal line. Children will not have the same mitochondrial DNA as their father. Mutations in the DNA occur, so over the generations there are differences even in the maternal line. Unlike nuclear DNA, which has been called a "fingerprint," mitochondrial DNA is more of an exceptionally detailed maternal family resemblance.
¶ 44. The significance of similarities between different mitochondrial DNA was addressed when the expert was asked how rare was the mitochondrial DNA sequence from the sample in this case.
"[T]he only way that we have to tell using mitochondrial DNA is just to make a data base of known DNA sequences from random samples of volunteers and to see how often we see any one particular sequence in a general data base and that will give us an idea as to how rare or how frequent we would expect to see that sequence."
¶ 45. In a national database used by this laboratory, there were 2,426 individuals *1062 whose mitochondrial DNA sequences had been recorded. Mr. Warren stated that there were no sequences found in the data base that matched the one taken from Adams and the one from the hair found at the crime scene.
¶ 46. There was also testimony that a very small portion of the population may share significant similarities in their mitochondrial DNA even though the individuals are not related within any measurable degree. The witness explained that "the most likely explanation for people having the same mitochondrial DNA sequence would be that they all come from the same maternal line." Warren indicated that just as a matter of normal coincidence approximately six people out of the 2,426 in the data base would have been expected to match the sequence of a sample that was being tested. None did here. "Therefore... it appears to us that this is a rare sequence."
¶ 47. Mr. Warren stated that the National Forensic Science Technology Center certifies laboratories for DNA testing, and his lab had been certified. No separate certification exists for mitochondrial DNA testing. He testified that there were generally accepted procedures for mitochondrial DNA testing and his laboratory used them. In his opinion, the scientific community has accepted these tests after what was then twenty years of work at different laboratories. Over 600 scientific publications have dealt with mitochondrial analysis. Specific use of mitochondrial DNA tests had begun about eight years earlier. He was aware of eleven states that had accepted these tests for criminal investigations.
¶ 48. Mr. Warren reviewed the procedures for the test. As the Supreme Court has discussed in its earlier analysis of the admissibility of nuclear DNA evidence, there are at this time two tests whose results have been admitted at criminal trials. The shorthand designations are RFLP analysis and PCR analysis. Genry v. State, 735 So.2d 186, 197 (Miss.1999). According to Mr. Warren, those same testing procedures are followed regardless of whether it is for an examination of the sequence of nuclear DNA or of mitochondrial DNA.
¶ 49. Genry analyzed a three-part process for determining if such evidence is admissible. I examine each part. Genry, 735 So.2d at 197-98.

The general acceptance of the theory in the scientific community .
¶ 50. Mr. Warren testified that mitochondrial DNA sequence analysis as a result either of a RFLP or a PCR test is generally accepted in the scientific community. No contrary evidence was offered.

Reliability of results from current techniques.
¶ 51. Initially it might appear that Adams's objections primarily flow from this factor. According to Mr. Warren, the results of the testing are considered completely reliable if reliability is not taken to mean absolute identification. He stated that the testing was one hundred percent accurate, meaning that what the test showed as the sequence of the mitochondrial DNA was beyond question the sequence. We find that this form of reliability is the point of the Polk and Genry test. There is another question that we discuss at the end of the three-part Polk-Genry discussion, namely, whether these completely reliable results prove enough to be relevant.

Propriety of the procedures followed by the laboratory in question
¶ 52. Regardless of how well-accepted the theory might be and the reliability of results in general, the specific evidence being introduced must be the result of the *1063 necessary procedures having been followed. Mr. Warren testified that the laboratory followed the proper procedures.
¶ 53. The only contrary argument by Adams was that some of the testing was done by a laboratory assistant and not by Warren. However, Warren personally conducted one analysis and supervised the assistant's work. In one precedent, the director of a DNA testing laboratory testified as an expert regarding the results of testing that largely had been performed by an assistant. The witness had performed the analysis of the test results herself and checked the procedures. Gray v. State, 728 So.2d 36, 55-57 (Miss.1998). As in the present case, the defendant raised a confrontation clause objection, relying on Kettle v. State, 641 So.2d 746, 749-50 (Miss. 1994). In Kettle the State sought to introduce results from laboratory testing through a records custodian. The Court found that "the person who conducted the test [must] appear and testify in person." Id. at 750. In Gray, the Court found no confrontation problem. The witness was the one "who evaluated the autoradiographs and did the sizing procedure.... She based her opinions and testimony on the results of her examinations of the test results. This was permissible testimony under Miss. R. Evid. 703 and did not violate Gray's Sixth Amendment right to confront witnesses." Gray, 728 So.2d at 57.
¶ 54. This evidence against Adams was not defective because of its sponsor.
¶ 55. The evidence offered at trial met the Polk-Genry considerations. What is still left in my view is even if the science is accepted, reliable, and properly applied at this laboratory to this sample, we still must decide whether the results are relevant. Do these results prove enough to be usable in a court of law? I look at what the expert said that his testing of these samples revealed.
The basic overall conclusion is the DNA sequence obtained from the defendant's reference sample and DNA sequence obtained from the evidentiary hair sample match each other. They are consistent with one another therefore the defendant can not be excluded as being a contributor for that hair.
¶ 56. Mr. Warren said that the sequence in Adams's sample was rare, and that "the most likely explanation for people having the same mitochondrial DNA sequence would be that they all come from the same maternal line." The tentativeness of the identification is obvious. Adams's counsel objected to the use of the word "match," but the meaning of the word had been explained. Matching did not mean that this was Adams's hair. Adams could not be excluded as the source of the hair, while most people in the general population could be excluded. The effect of this testimony is that it was likely that the person who left the hair at the crime scene was Adams himself or someone with whom Adams shared the same maternal line. It also could not be completely discounted but was unlikely that the hair came from an unrelated person in the larger population.
¶ 57. The inconclusiveness of the evidence did not make it inadmissible. Mississippi has permitted introduction of hair sample evidence prior to mitochondrial DNA testing even when the conclusions were far more ambiguous than here. In several cases evidence has been admitted when the only conclusion was that the sample hair showed characteristics of coming from someone of a particular race. Manning v. State, 726 So.2d 1152, 1180 (Miss.1998), overruled on other grounds by Weatherspoon v. State, 732 So.2d 158 (Miss.1999); Foster v. State, 493 So.2d 1304 (Miss.1986).
*1064 ¶ 58. In some cases the evidence was that the hair connected with the crime was of the same color and had the "same microscopic characteristics" as that of the accused. Lambert v. State, 777 So.2d 45 (¶ 4) (Miss.2001); Gray, 728 So.2d at 61. This did not prove identity but kept the accused from being excluded from the group of potential perpetrators.
¶ 59. Finally, the Supreme Court has allowed expert testimony comparing bitemark evidence. An expert witness "testified that while he could not say with medical certainty that Brooks [the accused] made the bite marks found on Courtney [the victim], he did find consistencies between the mold of Brooks' teeth and the bite marks on Courtney. Dr. Mincer further testified on cross-examination that he could not exclude Brooks as the biter and that, in his opinion, he could exclude the teeth from the other persons tested as the ones that had inflicted the bite marks in question." Brooks v. State, 748 So.2d 736, 740 (Miss.1999).
¶ 60. The rules of evidence permit the introduction of "relevant evidence." This is evidence that makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Quite obviously, this evidence of mitochondrial DNA was relevant. It does not confirm identity, but it makes the State's argument that Adams was the culprit more probably correct.
¶ 61. Even if relevant, the probative value of the evidence must not be outweighed by its unfair prejudice to the party against whom it is used or by its likelihood of confusing the issues or the jury. M.R.E. 403. I find that the science of mitchondrial DNA sequencing to have been adequately proven at trial under the standards of Polk v. State, 612 So.2d 381, 390 (Miss.1992). The lack of exactitude in the evidence appears to be far less than with previously allowed (non-DNA) hair sampling and bite mark evidence. The Rule 403 issue also should cause us to examine whether there is something inherently prejudicial about allowing mitochondrial DNA evidence, perhaps because of the danger that jurors will prejudicially consider it to be more conclusive than it really is.
¶ 62. The expert explained the limitations. Adams's counsel explored them as well. The defense counsel's closing question, perhaps receiving an answer close to what he wanted, was this:
[DEFENSE COUNSEL]: Let me just stop all the lawyer talk and all the scientist talk and [be] simplistic. Can you stand up and point to Mr. Adams and say it's his [hair]?
[EXPERT WITNESS]: No, sir, I can not.
[DEFENSE COUNSEL]: I think I will quit with that, your honor.
¶ 63. I find no inherent flaw in this evidence. It is true that jurors have to be paying attention, but that is true for all testimony and especially that of experts. It might be advisable for the trial judge to be especially vigilant that the jury is informed that mitochondrial DNA results are not exact in the sense of the layman's, including unscientifically-inclined judges', understanding of the better-known form of DNA testing. Yet, within the limits of the adversary-driven, judge-managed, jury-resolving system, I conclude that this scientific evidence is no more problematic than that which experts discuss in many other trials.
¶ 64. The trial judge addressed this issue with admirable care. I find it necessary to our affirmance that there was an initial hearing outside the presence of *1065 the jury under Polk-Genry to determine the validity of the science and the procedures followed by this specific laboratory. Once the court accepted the evidence at the conclusion of the hearing, care was taken to explain the evidence to the jurors. There was no perceptible effort by the State to make the evidence carry more weight than it deserved and the defense reemphasized the weaknesses.
¶ 65. When the admission of mitochondrial DNA evidence complies with these procedural safeguards, there is no error in its admission.
McMILLIN, C.J., CHANDLER, IRVING, MYERS, PAYNE, and THOMAS, JJ., join this separate opinion.