IRVING, J.,
for the Court:
¶ 1. This appeal arises out of Frederick Denell Grim’s conviction in the Tunica County Circuit Court for the sale of cocaine and the resulting sentence of life in the Mississippi Department of Corrections (MDOC) as a habitual offender. Feeling aggrieved, Grim appeals and asserts that: (1) the indictment that was used to charge him was fatally defective for failing to include the dates of sentencing for his prior convictions which were used to impose habitual-offender status; (2) he received ineffective assistance of counsel in the course of his jury trial and sentencing; (3) the circuit court erred when it refused to grant his motion for a directed verdict; (4) the circuit court erred when it denied his motion for a new trial; (5) the indictment was fatally defective for referencing two different habitual-offender statutes without specifying which statute would be used to confer habitual-offender status; and (6) cumulative error deprived him of his right to a fair trial.
*1125 ¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 3. On February 15, 2007, Captain Luis Hawkins with the Mississippi Bureau of Narcotics (MBN) met with Detective Chris Smith of the Tunica Police Department (TPD),[1] Major Terry Spillers of the MBN, Detective Cedric Milburn of the TPD, and Terry Reed, a confidential informant. Captain Hawkins testified that the officers decided that Reed would travel to different locations in Tunica, Mississippi, “in an attempt to purchase illegal drugs from known suspected drug violators in the area.” Captain Hawkins further testified that Reed was outfitted with both audio- and video-recording equipment. Captain Hawkins explained that Reed was searched at a pre-buy location and was given two hundred dollars in “official State funds” with which to attempt to purchase illegal drugs. Captain Hawkins testified that Reed was chosen to work as an informant after Reed, was arrested for selling marijuana. In exchange for non-prosecution, Reed agreed to work with the authorities as a confidential informant.
¶ 4. Captain Hawkins testified that Reed proceeded to 1521 Cotton Street[2] in Tuni-ca, Grim’s residence, after meeting with the officers at the pre-buy location. Captain Hawkins explained that Grim exited the residence and approached Reed’s vehicle and that both Reed and Grim entered the residence thereafter. After spending some time in the residence, Reed met officers for a post-buy meeting where he gave the officers cocaine that he had purchased from Grim. Captain Hawkins indicated that Reed was again searched at the post-buy meeting.
¶ 5. Reed testified and related the same series of events as Captain Hawkins. Specifically, Reed indicated that he met with the officers on February 15, 2007, and that they searched him before sending him to Grim’s house. Reed testified that Grim was outside when he arrived at the residence, that he then approached Grim, that both men got into Reed’s vehicle, and that they then went inside together, where Grim furnished him with cocaine in exchange for two hundred dollars. Reed explained that he then left Grim’s residence and proceeded to the post-buy location, where the officers again searched him and his vehicle. During his direct examination, the videotape of the buy was played for the jury, and Reed explained what was going on at various points in the videotape. Reed testified that he knew Grim prior to purchasing the cocaine from him on February 15.
¶ 6. Erik Frazure, a forensic scientist employed by the Mississippi Crime Laboratory, testified regarding the scientific tests that were performed on the cocaine that Reed had purchased. After an objection by Grim’s trial attorney, the jury was excused. The essence of the objection was that Frazure had not performed the actual tests, but had merely reviewed the tests. The following exchange occurred in perti-iient part:
[THE COURT]: For the purpose of this motion to exclude introduction, would you—
Frazure, what did you have to do with the test-let me see. What exhibit are we talking about?
[DEFENSE ATTORNEY]: The crime lab report.
*1126 [PROSECUTOR]: The crime lab report.
[THE COURT]: —the crime lab report of a matter involving Frederick Grim? Did you do anything specific when it comes to the analysis of this — what number is this?
[DEFENSE ATTORNEY]: S-2, I think.
[PROSECUTOR]: S-2 and S-3.
[THE COURT]: —of S-2?
[FRAZURE]: I did not physically analyze it myself, no, sir. What I did was — Mr. Fernandez, upon completion of his examinations, there are— there’s a work packet generated and there are also — that contains the results of the examinations. And such as in this case, a gas chromatograph, mass spectrometer was done, or the instrument was used. There was a mass spec generated.
[THE COURT]: There’s a what?
[FRAZURE]: Mass spec, a mass spectrum. It’s a — kind of a molecular fingerprint of the molecule.
And what I did was, I took that work packet and I reviewed the work packet to ensure that he did the proper tests, which was in this case a color test and a GC mass spec, ensured that those were both proper tests for this type of evidence, and I looked to see the results that he had and made sure that the results from those two examinations did coincide with the results that he — or the conclusion that he formed, and I made sure that that — the conclusion that he formed with his report was correctly [sic] with the conclusion that was in his work packet.
[THE COURT]: All right. So, you reviewed the results of the gas chroma-tograph and the gas spectrometer?
(Conferring with Mr. Kenneth Beh-rens.) [3]
[FRAZURE]: Gas chromatograph, mass spectrometer, and the chemical tests.
[THE COURT]: And you signed off on this test?
[FRAZURE]: Yes, sir.
[THE COURT]: Okay. I’m going to find that Frazure had had enough direct dealings with this particular — what do you call it when you look at — when you’re checking that stuff out?
[FRAZURE]: It’s a technical review.
[THE COURT]: —with the technical review of this cocaine to be allowed to testify.
But your objection is noted for the record.
After this exchange, Frazure went on to testify that the substance that was submitted to the laboratory contained 8.2 grams of cocaine. During cross-examination, Grim’s attorney questioned Frazure at length regarding the fact that he had not personally performed the analysis of the cocaine.
¶ 7. Grim did not testify or offer any witnesses in his defense. After being instructed, the jury found Grim guilty of the sale of cocaine. A little over two weeks later, the circuit court held a sentencing hearing. At the hearing, Gloria Gibbs, the records supervisor for the MDOC, testified regarding Grim’s prior convictions and the time that he had served for those convictions. Gibbs indicated that Grim had served at least a year each for two prior felony convictions. Grim also testified at *1127 the sentencing hearing, where he disputed Gibbs’s statement that he had served a year for a prior conviction for possession of cocaine. At the conclusion of all of the evidence, the circuit court found that the State had proven two prior convictions, each of which Grim had served at least a year for. When Grim’s attorney asked for clarification as to which convictions the State had proven, the circuit court refused to specify any particular convictions, instead referencing Gibbs’s testimony and the documents introduced by the State.
¶ 8. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Sentencing Dates

¶ 9. In his first contention of error, Grim claims that the indictment that was used to charge him was fatally defective because it did not include the dates of sentencing for his prior convictions that were used to prove habitual-offender status. Grim further contends that the State failed to introduce any proof of the dates of his sentences at his sentencing hearing.
¶ 10. As already stated, Gibbs testified at the hearing that Grim had served at least a year in prison on two prior felony charges. While the documents that were produced by the State were not as clear, Gibbs’s testimony was sufficient to prove Grim’s habitual-offender status. As to the presence of the sentencing dates in the indictment, Rule 11.08(1) of the Uniform Rules of Circuit and County Court states that a habitual-offender indictment “must allege with particularity the nature or description of the offense constituting the previous convictions, the state or federal jurisdiction of any previous conviction, and the date of judgment.” (Emphasis added). The indictment here listed Grim’s prior convictions, including each cause number, the courts of conviction, the dates of the convictions, what crime Grim had been convicted of for each conviction, the dates of the offenses, and the length of sentences that Grim received. Clearly, this information complied with the requirements of Rule 11.03(1). The rule does not require that an indictment allege the date of sentencing for a prior offense; rather, the rule requires that the indictment list the date of judgment of the prior convictions. The indictment here did exactly that.
¶ 11. This contention of error is without merit.

2. Ineffective Assistance

¶ 12. In his second contention of error, Grim contends that he received ineffective assistance of counsel at both his trial and his sentencing hearing. Specifically, Grim complains that his attorney allowed him “to be sentenced to a term of life ... by a judge rather then [sic] a jury, without the slightest objection and in the face of clear United States Supreme Court precedent ... that a jury should make the determination in regards to enhancement of a penalty....” Grim also complains that his attorney urged him to plead guilty and that his attorney failed “to raise numerous ... issues and deficiencies which are set out in this brief.” Since we find no merit to any of the other contentions raised by Grim in his appellate brief and the record inadequate to address this issue, we affirm his conviction and sentence without prejudice to his right to raise this issue, if he desires to do so, during appropriate post-conviction proceedings where he will be able to present a more adequate appellate record to support his contentions. See Read v. State, 430 So.2d 832, 841 (Miss.1983).

*1128
3. Sufficiency of the Evidence

¶ 13. In this contention of error, Grim challenges the sufficiency of the evidence supporting his conviction. Specifically, Grim challenges the adequacy of the evidence that was offered to prove that the substance sold was cocaine, because the individual that did the analysis did not testify. In looking at the sufficiency of the evidence, the ultimate question is whether, “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 14. There are several Mississippi appellate cases addressing who may testify regarding laboratory-analysis results. In Kettle v. State, 641 So.2d 746, 750 (Miss.1994), the Mississippi Supreme Court reversed Jerry Kettle’s conviction for sale of cocaine because Kettle “was entitled to have the person who conducted the [drug-analysis] test appear and testify in person.” In Kettle, the State called the custodian of the drug-analysis records to testify regarding the analysis of the chemical that Kettle allegedly sold. Id. at 749. On appeal, the Mississippi Supreme Court held that: “While it is true that a custodian under the rule could introduce the records in his care and custody, he cannot satisfy the right to confront witnesses when properly invoked.” Id.
¶ 15. However, the laboratory technician who physically performed the drug analysis need not testify as long as someone with adequate involvement with the testing process testifies. For example, in Gray v. State, 728 So.2d 36, 55 (¶ 79) (Miss.1998), Melissa Smrz testified regarding DNA-analysis evidence that was used to help identify Rodney Gray as the perpetrator. Smrz testified that she did not personally conduct the DNA testing but that she did “everything up to the point of evaluating the autoradiographs and doing the sizing and writing-” Id. at (¶80). Smrz explained that her “role is somewhat like a doctor in a hospital who has a lot of individuals who work on patient information or patient data, like a laboratory technician, or a nurse, or X-ray technician, and then that doctor is responsible for putting all that information together and evaluating and making [a] diagnosis.” Id. at (¶ 81). Gray contended that his right to cross-examine the witnesses against him was violated by Smrz’s testimony because “he could not cross-examine Ms. Smrz as to how the actual tests were performed, other than what the procedure was.... ” Id. at 57 (¶ 88). In so arguing, Gray relied on Kettle. Id. at (¶ 89). The Mississippi Supreme Court found no merit to Gray’s contentions, finding that “Gray was able to confront and cross-examine the expert who evaluated the autoradiographs and did the sizing procedure....” Id. at (¶90). The court noted that Smrz’s conclusions were based “on the results of her examinations of the test results.” Id.
¶ 16. This Court has also held that the analyst who physically performed tests does not necessarily need to testify at trial. In Adams v. State, 794 So.2d 1049, 1057-58 (¶¶ 23-24) (Miss.Ct.App.2001), this Court found no error with the testimony of Joseph Warren, a State’s witness who supervised, but did not conduct, the relevant laboratory procedures. We specifically found that: “Kettle does not apply in the case at hand because Warren supervised, witnessed[,] and checked the tests performed by his technician. Warren is not so far removed from the process as to be reduced to the level of a records custodian.” Id. at (¶ 24). Similarly, in Mooneyham v. State, 842 So.2d 579, 587 (¶27) *1129 (Miss.Ct.App.2002), this Court found no error with a trial court’s decision to allow the testimony of a forensic scientist whose primary job was to “verify” the laboratory results that had been generated by technicians. Id. at (¶ 25). We found that the technician “testified that she had to verify the results of the analysis. Therefore, she was capable of testifying to the test results.... ” Id, at (¶ 27).
¶ 17. We can find no difference between Frazure’s role in this case and the role of the expert in Mooneyham. As already discussed, Frazure testified that he reviewed the results that were generated by the technician and ensured that the proper tests were performed. His involvement was more than that of a mere custodian of records. Frazure’s testimony properly established that the substance sold by Grim was, in fact, cocaine.
¶ 18. Grim makes no further contention regarding any insufficiency in the evidence against him. Having reviewed the record, we find that reasonable jurors could have found Grim guilty of every element of the sale of cocaine beyond a reasonable doubt. Therefore, the evidence is sufficient to sustain his conviction.
¶ 19. This contention of error is without merit.
A Weight of the Evidence
¶ 20. Grim also contends that his conviction is against the overwhelming weight of the evidence. In reviewing the weight of the evidence supporting a conviction, an appellate court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)).
¶ 21. As with his argument regarding the sufficiency of the evidence, Grim relies on the testimony of Frazure to attack the weight of the evidence supporting his conviction. As discussed above, we find no error with Frazure’s testimony regarding the substance analysis in this case. Grim also references the State’s jury instructions S-2 and S-3. However, he does not state what was contained in those instructions, and, as he notes, they are not contained in the record before us.
¶ 22. Based on all the evidence presented at trial, allowing Grim’s conviction to stand will not “sanction an unconscionable injustice.” This contention of error is also without merit.

5. Propriety of Indictment

¶ 23. In this contention of error, Grim contends that the State’s indictment improperly cited both Mississippi Code Annotated section 99-19-81 (Rev.2007) and section 99-19-83 (Rev.2007). The State urges us to find that this issue is procedurally barred due to Grim’s failure to raise the issue before the circuit court.
¶ 24. We cannot find in the record before us where this issue was ever raised before the circuit court. Therefore, we conclude that the issue is procedurally barred. Puckett v. State, 737 So.2d 322, 349 (¶¶ 80-81) (Miss.1999). However, even were this issue not procedurally barred, we would still find it without merit. In Henderson v. State, 878 So.2d 246, 247-48 (¶¶ 10-11) (Miss.Ct.App.2004), Efrem Henderson was charged under two habitual-offender provisions, including section 99-19-81. At trial, the State elected to proceed under section 99-19-81. Id. at (¶ 10). This Court found that: “Both statutes were cited in the indictment. That double reference was sufficient to give Henderson notice that he could be sentenced under either and gave him a fair *1130 opportunity to present a defense.” Id. at 248 (¶ 11). Similarly, the two citations here put Grim on notice that he could be sentenced under either statute.
¶ 25. This contention of error is without merit.

6. Cumulative Error

¶ 26. In his final issue, Grim contends that cumulative errors deprived him of his right to a fair trial. As we have found no error to any of Grim’s contentions, we find no cumulative error. As our supreme court has stated: “Since all the assignments of error have been found to be without merit, there is no error, harmless or otherwise. Without harmless error, there can be no cumulative error.” Wilson v. State, 21 So.3d 572, 591 (¶ 59) (Miss.2009).
¶27. This contention of error is also without merit.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF TUNICA COUNTY OF CONVICTION OF SALE OF COCAINE AND SENTENCE, AS A HABITUAL OFFENDER WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE SENTENCE TO RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TUNICA COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. Captain Hawkins testified that, as of the time of trial, Detective Smith had become an agent with the MBN.

. Captain Hawkins later testified that the address was 1251 Cotton Street.

. The record reflects that the circuit judge conferred several times with Behrens, whose role with the circuit court is unknown.