STATE of Wisconsin, Plaintiff-Respondent,†

v.

Luther WILLIAMS, III, Defendant-Appellant.

Supreme Court

*No. 00–3065–CR. Oral argument April 16, 2002.—Decided June 6, 2002.*

2002 WI 58

(Also reported in 644 N.W.2d 919.)

† Motion for reconsideration denied; opinion modified. *See* 2002 WI 118, 256 Wis. 2d 56, 652 N.W.2d 391.

102

For the defendant-appellant there were briefs and oral argument by *Martha K. Askins,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Diane M. Welsh,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. ANN WALSH BRADLEY, J. The court of appeals certified Luther Williams, III's appeal from the

judgment convicting him of possession of cocaine with intent to deliver, gambling, and contributing to the delinquency of a child.[1] Williams argues that his right to confrontation was violated when the circuit court admitted into evidence a state crime lab report to prove the presence of cocaine and when the court allowed the crime lab unit leader to testify based on the report in lieu of the analyst who performed the tests.

¶ 2. We determine that Williams' right to confrontation was not violated when the unit leader, rather than the analyst who performed the tests, testified in part based on the report containing the lab test results. In addition, we determine that the circuit court erroneously admitted the report under Wis. Stat. § 908.03(6) (1997–98),[2] the hearsay exception for a record of regularly conducted activity (business record). However, the admission of the report was harmless error in light of the unit leader's testimony and other circumstances. We also reject other arguments Williams makes regarding an evidentiary ruling, the right to present a defense, and sufficiency of the evidence. Accordingly, we affirm the circuit court.

I

¶ 3. While on patrol, police officers found Williams and other individuals gambling behind a church. At least one of the individuals, James D., was a minor. An officer witnessed yet another individual fleeing the scene. A jacket was lying on the ground near Williams, and inside the jacket, police found a plastic bag contain-

---

[1] Williams appealed from a judgment of the Circuit Court for Racine County, Emily S. Mueller, Judge.

[2] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

ing a substance that appeared to be cocaine. Williams was charged with possession of cocaine with intent to deliver, gambling, and contributing to the delinquency of a child.

¶ 4. At the trial on these charges, the State introduced a state crime lab report showing that the substance in the jacket tested positive for cocaine base. The analyst who performed the tests underlying the report originally was scheduled to testify, but after Williams requested an adjournment, the State was unable to produce the analyst. Instead, the State presented the testimony of Sandra Koresch, a unit leader in the drug identification section of the crime lab who performed the peer review on the tests the analyst conducted. Based in part on the contents of the lab report, Koresch testified that the substance in the jacket contained cocaine base.

¶ 5. Williams moved to strike Koresch's testimony and asked the court to exclude the crime lab report from evidence. He argued that he was being denied his right to cross-examine the analyst who performed the tests. The circuit court disagreed, determining that the lab report fell within Wis. Stat. § 908.03(6), commonly referred to as the "business records" exception to the general rule that hearsay is inadmissible.[3] In addition, the court determined that Koresch's presence and testimony satisfied Williams' right to confrontation.

¶ 6. The jury convicted Williams on all three charges, and he appealed. The court of appeals certified the case to us pursuant to Wis. Stat. § (Rule) 809.61,

[3] As indicated by the plain language of Wis. Stat. § 908.03(6), and as the parties do not dispute, this hearsay exception is not limited to business records. However, for shorthand convenience we refer to § 908.03(6) as the business records exception throughout this opinion.

noting that "the proposition proffered by the State proposes a rather broad and momentous declaration: that the State no longer need produce the expert or analyst who performs testing in a criminal trial where the business records exception comes into play."

## II

¶ 7. The central question we address is whether Williams' right to confrontation was violated when Koresch, rather than the analyst who performed the tests, testified in part based on the crime lab report containing the lab test results. Although a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review. *State v. Ballos*, 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999).

¶ 8. In addition, we must determine whether the state crime lab report was admissible as a business record under the hearsay exception in § 908.03(6). When an evidentiary issue requires the construction of a statute, a question of law is presented for independent appellate review. *State v. Jagielski*, 161 Wis. 2d 67, 73, 467 N.W.2d 196 (Ct. App. 1991). Finally, we address other arguments Williams makes regarding an evidentiary ruling, the right to present a defense, and sufficiency of the evidence.[4]

---

[4] The State moves to strike Williams' appendix to his brief. It asserts that the inclusion of excerpts from the *BNA Criminal Practice Guide* and copies of articles pertaining to drug analysis and crime labs are outside the scope of what is permissible in an

## III

■

¶ 9. We begin with the central issue before us, whether Williams' right to confrontation was violated when Koresch, rather than the analyst who performed the tests, testified in part based on the crime lab report containing the lab test results. Williams asserts that his right to confrontation required that the analyst testify.

¶ 10. This assertion presents a question of first impression in Wisconsin, and we turn to persuasive authority from other jurisdictions addressing identical issues for guidance. Consistent with this authority, we conclude that the admission of Koresch's testimony in lieu of that of the analyst did not violate Williams' right to confrontation.

¶ 11. Various courts have concluded that under certain circumstances the right of confrontation may be satisfied by the admission of expert testimony based upon lab test results even where the actual tester is not

---

appendix. Wisconsin Stat. § (Rule) 809.19(2) indicates that an appellant's brief "shall include a short appendix providing" certain enumerated items.

The State's position assumes that these enumerated items are to the exclusion of all others. We decline to give the rule such a restrictive interpretation. The Judicial Council Committee's Note to § (Rule) 809.19 provides that an appendix "is designed to be nothing more than a useful tool to the members of the court." Members of the court on occasion find materials such as those at issue here to be of some assistance. We note that Williams' appendix contains "portions of the record essential to an understanding of the issues raised" as required by the rule. Accordingly, we deny the motion to strike.

Nonetheless, we take this opportunity to remind litigants that the rule calls for a "short" appendix. It is the rare case where a lengthy appendix is more boon than bane.

also present to testify. *See Reardon v. Manson,* 806 F.2d 39 (2d Cir. 1986); *Adams v. State,* 794 So. 2d 1049 (Miss. Ct. App. 2001); *State v. Kennedy,* 7 S.W.3d 58 (Tenn. Crim. App. 1999). In each case, the testifying expert was highly qualified and had a close connection with the testing in the case such that the expert's presence at trial satisfied the defendant's rights to confront and cross-examine.

¶ 12. For example, in *Kennedy,* a defendant was convicted of aggravated rape after expert testimony matched his DNA profile to that of semen taken from the rape victim. 7 S.W.3d at 60, 63. The testifying witness, an FBI expert in the field of DNA analysis and identification, was not the person who prepared the DNA samples for evaluation. *Id.* at 66. However, he "checked the computations of the technician and verified that the technician would have followed the standard laboratory procedures." *Id.*

¶ 13. The *Kennedy* court concluded that the admission of the expert's opinion did not violate the defendant's right to confrontation because the expert providing the opinion was available for cross-examination. 7 S.W.3d at 67. Given the expert's close connection to the testing, "the defense was able to thoroughly cross-examine [him] as to the samples, procedures, safeguards, and results reached" in the particular case. *Id.* at 67.

¶ 14. Similarly, in *Adams* the testifying witness was "eminently qualified" in molecular biology, and although he did not personally perform the DNA tests, he supervised "all aspects" of the laboratory technician's work. 794 So. 2d at 1057. He testified that the procedures were the same as those used by the FBI and that they were generally accepted procedures in the scientific community. *Id.* On these facts, the court in *Adams*

rejected the defendant's assertion that he was denied his right to confrontation because the expert did not perform the test. *Id.*

¶ 15. The analysis in *Reardon* is also highly persuasive. *Reardon* was a drug identification case on habeas corpus review. The illegal nature of the substances seized from the two defendants was established through testimony of one of three toxicologists, Dr. Reading, who supervised approximately two dozen chemists at a state laboratory. *Reardon,* 806 F.2d at 41. Although the testifying toxicologist did not perform the tests on the substances, he oversaw the procedures and promptly examined the results. *Id.*

¶ 16. The court in *Reardon* disagreed with the district court's determination that the admission of the toxicologist's testimony violated the defendants' right to confrontation. 806 F.2d at 40. The court reasoned as follows:

> In view of the fact that Dr. Reading's laboratory performs some 20,000 chemical tests each year, it is most unlikely that the chemists who assisted Dr. Reading would have any independent recollection of the tests they performed. Their testimony inevitably would have been based on their laboratory notes, which Dr. Reading was well qualified to interpret.

*Id.* at 41. Thus, the court concluded, "there would have been little potential utility in requiring the State to produce the assisting chemists for cross-examination." *Id.* The court added, "[e]xpert reliance upon the output of others does not necessarily violate the confrontation clause where the expert is available for questioning concerning the nature and reasonableness of his reliance." *Id.* at 42.

¶ 17. Also relevant to our confrontation inquiry is *United States v. Lawson,* 653 F.2d 299 (7th Cir. 1981).

There, a chief of psychiatry gave expert testimony for the government against a defendant advancing an insanity defense. *Id.* at 301. The expert had some contact with the defendant, but based his opinion in part on reports he received from two examining physicians and other staff. *Id.*

¶ 18. The court in *Lawson* agreed with the defendant that expert testimony based in part on such hearsay may raise confrontation problems, but concluded that under the circumstances the defendant had an adequate opportunity to cross-examine the expert. 653 F.2d at 301. At the same time, the court recognized that expert testimony based entirely on hearsay reports would violate a defendant's right to confrontation. *Id.* at 302. The right to confrontation is not satisfied when the government produces a witness who does nothing but summarize out-of-court statements and opinions made by others. *Id.*

¶ 19. The critical point illustrated by *Lawson* is the distinction between an expert who forms an opinion based in part on the work of others and an expert who merely summarizes the work of others. In short, one expert cannot act as a mere conduit for the opinion of another.[5]

---

[5] *Cf. State v. Towne*, 453 A.2d 1133 (Vt. 1982). In *Towne,* also an insanity defense case, the government's expert gave his opinion as to the defendant's sanity, then testified that a leading expert in the field with whom he had consulted agreed with his opinion. The court determined that this testimony violated the defendant's right to confrontation. *Id.* at 1136. It explained that although an expert may rely on facts or data provided by another expert in rendering his own opinion, confrontation is offended if one expert is merely "acting as a conduit" for the expert opinion of another. *Id.* at 1135.

¶ 20. Taken together, these cases teach that the presence and availability for cross-examination of a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders her own expert opinion is sufficient to protect a defendant's right to confrontation, despite the fact that the expert was not the person who performed the mechanics of the original tests. Given Koresch's qualifications and experience, her close connections to the tests and procedures implicating Williams, and her expert opinion that the tested substance contained cocaine, we determine that the admission of her testimony did not violate Williams' right to confrontation.

¶ 21. At trial, Koresch explained that she is a forensic scientist in drug identification who has been employed by the state crime lab for over nine years. She analyzes evidence for the presence or absence of controlled substances and is unit leader of the drug identification section of the lab. In addition, she holds a bachelor's degree in chemistry and has taken postgraduate courses at the University of Wisconsin, Milwaukee. She has analyzed samples for the presence of a controlled substance between 5,000 and 6,000 times. Thus, like the testifying experts in *Kennedy, Adams,* and *Reardon,* Koresch was highly qualified to render an expert opinion based on the information before her.

¶ 22. Also, like the experts in *Kennedy, Adams,* and *Reardon,* Koresch was closely connected to the tests and procedures involved in the case and supervised or reviewed the testing. She testified that she was familiar with the various tests performed on the substance found in the jacket pocket. Upon cross-examination, Koresch indicated that she performed the

peer review on the tests of this substance. Her testimony also revealed that the peer review entailed "making sure that all the notes coincide with the evidence, that the data coincides with [the] conclusion and just basic overall looking at all the data that has been collected in the case. This is done right after the report is written." On redirect, Koresch added that "peer review is meant to make sure that conclusions written in a report are correct."

¶ 23. Explaining an example of how peer review is conducted, Koresch testified that she would look at the data the tests yielded in the form of graphs and compare those graphs to standard graphs. Such a comparison would, in turn, lead her to the conclusion that the sample being tested was a controlled substance.

¶ 24. In fact, it was some of these circumstances that helped lead the circuit court to its conclusion that Williams' right to confrontation was not violated. The court reasoned as follows:

> [A]lthough Ms. Koresch was not the lab analyst, she performed the peer review as part of her regular duties and also testified that she did the peer review specifically as to this test that had been done by another analyst. She indeed reviews all of the information as I understand it and the procedures that were undertaken by Ms. Ronge who's the actual lab analyst.

¶ 25. Finally, Koresch testified that based on this peer review, as well as her review of the relevant records, it was her opinion that the substance tested in this case contained cocaine base. Thus, like the expert in *Lawson,* although she based part of her opinion on facts and data gathered by someone else, she was not merely a conduit for another expert's opinion.

¶ 26. Consistent with the reasoning of the circuit court and with the reasoning of the courts in *Kennedy,*

*Adams, Reardon,* and *Lawson,* we determine that Williams' right to confrontation was not violated when Koresch, rather than the analyst who performed the tests, testified in part based on the crime lab report containing the lab test results. Because Koresch was a highly qualified expert employed by the lab who was familiar with the particular lab procedures and performed the peer review in this particular case, then gave an independent expert opinion, her presence was sufficient to satisfy Williams' right to confrontation.

¶ 27. Williams nonetheless contends that Koresch's testimony was not admissible as an expert opinion because the lab report on which it was partly based is inadmissible hearsay. He argues that Koresch had to test the substance herself in order to render an expert opinion.

¶ 28. An expert opinion may be based on inadmissible hearsay. Wis. Stat. § 907.03; *State v. Watson,* 227 Wis. 2d 167, 195, 595 N.W.2d 403 (1999). Section 907.03 provides:

> Bases of opinion testimony by experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Here, there is little question that the tests are of a type reasonably relied upon by experts in the field. Koresch testified that all the tests performed were routinely used in the identification of controlled substances. The

cobalt thiocyanate test is a commonly used color change test useful for preliminary screening. Paul C. Giannelli and Edward J. Imwinkelried, 2 *Scientific Evidence* § 23–2, 352–54 (3d ed. 1999). The gas chromatography/mass spectrometry and infrared spectroscopy tests described by Koresch and utilized in this case also are widely used. *Id.* at § 23–2, 352, § 23–3(A) and (C).

■

¶ 29. Section 907.03 implicitly recognizes that an expert's opinion may be based in part on the results of scientific tests or studies that are not her own. It is rare indeed that an expert can give an opinion without relying to some extent upon information furnished by others. *Reardon,* 806 F.2d at 42. Thus, contrary to Williams' assertion, Koresch need not have performed the tests herself to form an admissible expert opinion based upon them, and Williams' characterization of Koresch's testimony as something other than an expert opinion lacks merit.

¶ 30. Koresch explained that her review of the data for each test indicated the presence of cocaine. The State elicited the following testimony from her:

Q. Before coming to court today did you review all these records?

A. Yes, I did.

Q. And based on your review do you have an opinion as to the contents of Exhibit 2 [the substance taken from the jacket pocket]?

A. Yes, I do.

Q. And what is that opinion?

A. State's Exhibit No. 2 contains cocaine base.

¶ 31. Considering Koresch's qualifications and the nature of her testimony, we agree with the State that she gave expert opinion testimony within the meaning of § 907.03. Her expert opinion properly could be based in part on the report of another, even if that report was otherwise inadmissible hearsay.

## IV

¶ 32. Our determination that the admission of Koresch's expert opinion testimony did not violate Williams' right of confrontation does not end our inquiry. Williams asserts that the state crime lab report was erroneously admitted hearsay and presents its own confrontation problem. Similarly, the question certified by the court of appeals includes an inquiry into whether the admission of the lab report into evidence under the business records hearsay exception in § 908.03(6) was proper.

¶ 33. The threshold question in examining whether a defendant's right to confrontation is violated by the admission of hearsay evidence is whether that evidence is admissible under the rules of evidence. *State v. Bauer,* 109 Wis. 2d 204, 210, 325 N.W.2d 857 (1982). If the evidence does not fit within a recognized hearsay exception, it must be excluded. *Id.* Only after it is established that the evidence fits within a recognized hearsay exception does it become necessary to consider confrontation. *Id.* Here, we determine that the lab report does not fit within the business records hearsay exception as the State asserts and therefore do not reach the confrontation question.

118

■

¶ 34. The parties do not dispute that the state crime lab report in this case is hearsay. As a general rule, hearsay is not admissible evidence. *See* Wis. Stat. § 908.02; *State v. Cardenas-Hernandez,* 219 Wis. 2d 516, 526, 579 N.W.2d 678 (1998). However, there are numerous exceptions to the hearsay rule, one being the business records exception in § 908.03(6).

¶ 35. Section 908.03(6) provides that although hearsay, the following are not necessarily inadmissible:

> RECORDS OF REGULARLY CONDUCTED AC-TIVITY. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, unless the sources of information or other circumstances indicate lack of trustworthiness.

Williams asserts that the crime lab report does not fall within the confines of § 908.03(6). The State, in contrast, argues that it does.

■

¶ 36. The question of whether state crime lab reports that incriminate a criminal defendant fall within the business records exception is another question of first impression in Wisconsin. Thus, we examine interpretations of the business records exception by courts in other jurisdictions. In addition, we turn to secondary authority for guidance. We also find support for our conclusion in the statutes pertaining to the state crime labs.

¶ 37. Courts in some jurisdictions have held that lab reports, including reports like those at issue here,

may fall within the business records exception. *See, e.g., United States v. Baker,* 855 F.2d 1353, 1359 (8th Cir. 1988); *State v. Cosgrove,* 436 A.2d 33, 37 (Conn. 1980); *State v. Kreck,* 542 P.2d 782, 785 (Wash. 1975). Other courts have held that such reports do not fall within the business records exception. *See, e.g., United States v. Oates,* 560 F.2d 45, 68 (2d Cir. 1977); *State v. Rivera,* 515 A.2d 182, 184, 187 (Del. Super. Ct. 1986); *People v. McClanahan,* 729 N.E.2d 470, 474 (Ill. 2000); *Kennedy,* 7 S.W.3d at 67 n.8.

¶ 38. Although these courts do not all use the same approach to the question, we have identified a fundamental underlying tension between the fact that crime lab reports may be records of regularly conducted activity and the fact that they are also records prepared in anticipation of litigation. Records prepared in anticipation of litigation traditionally have been deemed outside the reach of the business records exception. *Palmer v. Hoffman,* 318 U.S. 109, 113–14 (1943); *McLanahan,* 729 N.E.2d at 474; *see also United States v. Blackburn,* 992 F.2d 666, 670 (7th Cir. 1993) (adhering to "well-established rule" that documents made in anticipation of litigation are not admissible under the business records exception).

¶ 39. Commentators are in accord. Professor Blinka explains that even where proffered evidence seems to satisfy the foundational elements of § 908.03(6), the language of the statute makes plain that the evidence is not admissible when "sources of information or other circumstances indicate lack of trustworthiness." 7 *Wisconsin Practice* § 803.6, 627 (2d ed. 2001). "This consideration will most often come into play where there is some question about the motivation

behind the making of the record. Documents prepared in 'anticipation of litigation' pose special problems." *Id.* at 627–28.

¶ 40. Likewise, Professors Giannelli and Imwinkelried write with regard to the business records exception that "the admissibility of records prepared in anticipation of litigation[] remains problematic." 1 *Scientific Evidence* § 6.2(C), 313 (footnote omitted). They also criticize the ready categorization of lab reports within hearsay exceptions such as § 908.03(6): "Although business and public records generally may bear adequate indicia of reliability, laboratory reports may not. Laboratory reports typically are prepared in anticipation of prosecution and, although probably rare, they can be falsified." *Id.* at § 6.4(C), 329.

¶ 41. State crime lab reports like the one at issue here reasonably may be characterized as prepared within the regular course of the "business" of the state crime lab. However, such reports are prepared primarily to aid in the prosecution of criminal suspects.

¶ 42. In each of the cases cited by the State in which courts have determined that lab reports may fall within the business records exception, the courts failed to acknowledge or address the rule that records prepared in anticipation of litigation ordinarily do not fall under the business records exception. *See Baker,* 855 F.2d at 1359–60; *Cosgrove,* 436 A.2d at 37; *Kreck,* 542 P.2d at 785.[6] In contrast, we, like the court in *McLana-*

---

[6] In two Wisconsin cases addressing the admissibility of police reports under the business records exception, courts determined that the reports at issue were not admissible under the exception. *See Mitchell v. State,* 84 Wis. 2d 325, 330, 334, 267 N.W.2d 349 (1978); *State v. Gilles,* 173 Wis. 2d 101, 113–14, 496 N.W.2d 133 (Ct. App. 1992). The courts noted, however that police reports may be admissible under some circumstances. *See*

*han,* are mindful of the fact that state crime lab reports such as the one at issue here are "prepared during the course of criminal investigations and are requested by the State in anticipation of prosecutions." 729 N.E.2d at 474.

¶ 43. Similarly, we agree with the court in *Kennedy.* In declining to admit a DNA analysis under the business records exception, the court explained "[t]he DNA analysis prepared in the present case was for no other purpose but this litigation, calling into question the report's reliability as a business record." *Kennedy,* 7 S.W.3d at 67 n.8. Here, the state crime lab report, like the DNA analysis in *Kennedy,* was prepared for no other purpose but the prosecution of Williams.

¶ 44. That state crime lab reports also may be characterized as records of regularly conducted activity is only incidental. This is underscored by the statute that defines the duties of the state crime labs.

¶ 45. Wisconsin Stat. § 165.75, the primary statute section relating to state crime labs, is placed within the chapter of the statutes entitled "Department of Justice." Section 165.75(3)(a) explains that the primary purpose of the labs is to "provide technical assistance to local law enforcement officers in the various fields of scientific investigation in the aid of law enforcement."[7]

¶ 46. Section 165.75(3)(a) also states that included in the duties of the crime lab is to maintain services and employ the necessary specialists "for the

*Mitchell,* 84 Wis. 2d at 330; *Gilles,* 173 Wis. 2d at 113. Neither *Mitchell* nor *Gilles* addressed the significance of whether such reports were prepared in anticipation of litigation.

[7] The letterhead on the crime lab report indicates that the lab is part of the Department's "Division of Law Enforcement Services."

122

recognition and proper preservation, marking and scientific analysis of evidence material in the investigation and prosecution of crimes." Subsection (d) of the statute adds that "[t]he services of the laboratories available .... shall include appearances in court as expert witnesses."

¶ 47. Additionally, as the court of appeals forewarned in its certification, to allow the admission of such an evaluative report under the business records hearsay exception could constitute a "momentous declaration." Indeed, once an evaluative report such as this is deemed to constitute a business record under § 908.03(6), a mere custodian of the report, who knows nothing about the science underlying the report, is sufficient to lay the necessary foundation for admission of the report. Once that door is opened, the specter of the State submitting its case by means of unchallenged documentary evidence appears, and confrontation principles are compromised.

¶ 48. There can be little question that when state crime labs generate reports like those at issue here, they are acting as an arm of the State in assisting it to prevail in litigation and secure a conviction of the defendant. The state crime lab exists in large part to facilitate the investigation and prosecution of crimes.

¶ 49. Thus, considering the statutory scheme and the rule that records prepared in anticipation of litigation generally do not fall within the business records exception to the hearsay rule, we determine that the state crime lab report prepared for Williams' prosecution was erroneously admitted as a business record under § 908.03(6).[8]

---

[8] Our determination does not mean that state crime lab reports are inadmissible in every case. For example, the court in *Reardon v. Manson,* 806 F.2d 39, 41 (2d Cir. 1986), recognized

¶ 50. At the same time, however, we determine that the erroneous admission of the lab report was harmless error. The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction. *State v. Jackson,* 216 Wis. 2d 646, 668, 575 N.W.2d 475 (1998). A reasonable possibility is a possibility sufficient to undermine our confidence in the conviction. *State v. Grant,* 139 Wis. 2d 45, 51, 406 N.W.2d 744 (1987).

¶ 51. The lab report was admitted for the purpose of proving that the tested substance was cocaine. There was ample other evidence, however, to support such a conclusion.

¶ 52. As we have already determined, Koresch's testimony, though based in part on the report, was both an admissible expert opinion under § 907.03 and not in violation of Williams' confrontation right. Her testimony was compelling and credible evidence from which the jury could conclude that the substance in the jacket pocket was cocaine.

¶ 53. Other evidence heard by the jury bolsters our confidence. Three police officers who were on the scene when Williams was gambling testified that they believed that the substance they found in the jacket was crack cocaine. Of these officers, two had approximately five years' experience on the City of Racine Police Department and received specialized training for drug investigation. These two officers were members of the

that analysts testifying at trial may in some cases have no independent recollection of tests performed. In such cases, the report would be admissible under Wis. Stat. § 908.03(5), the hearsay exception for recorded recollection. *See State ex rel. Huser v. Rasmussen,* 84 Wis. 2d 600, 609–10, 267 N.W.2d 285 (1978).

target enforcement unit, which deals with, among other crimes, open air drug sales, street-level drug violations, and other narcotics violations. Although Williams' theory of defense was that the jacket, and therefore the substance in it, did not belong to him, both target enforcement unit officers testified they had seen him wearing it on many occasions.

¶ 54. In addition, our harmless error analysis is informed by the fact that on the morning trial was to begin, Williams indicated that he was willing to stipulate that the lab analyst's testimony was unnecessary and that "all the proper tests were done, et cetera" if the court would adjourn until the next morning.[9] His willingness to stipulate, combined with Koresch's properly admitted testimony and the other evidence, preserves our confidence in his conviction and therefore convinces us that the admission of the state crime lab report was harmless error.

¶ 55. In sum, we determine that Williams' right to confrontation was not violated when Koresch, rather than the analyst who performed the tests, testified in part based on the crime lab report containing the lab test results. We further determine that, although the circuit court erroneously admitted the state crime lab report under the business records exception, its admission was harmless error.

V

¶ 56. Having made these determinations, we turn to address other arguments that Williams makes in attacking his conviction. He asserts that the circuit court incorrectly excluded evidence and that the exclu-

---

[9] After the court denied Williams the full amount of time for adjournment that he requested, he withdrew his stipulation.

sion violated his right to present a defense. He also argues that the evidence at trial was insufficient to sustain a jury finding of guilt on one of the charges. We first address the evidentiary ruling.

¶ 57. The circuit court excluded hearsay testimony offered by Williams in support of his theory of defense that the jacket containing the cocaine did not belong to him. Specifically, Williams offered testimony by Dartavius Shelton that a Robert Winston told Shelton that it was his coat that was left at the church and that there was some "shit" in it, meaning some kind of drugs. Williams asserts, as he did at trial, that this testimony was admissible hearsay because Winston's comment to Shelton was a statement against interest.

¶ 58. Wisconsin Stat. § 908.045(4) contains the hearsay exception for statements against interest. This exception has two basic requirements. The declarant must be unavailable and the declarant's statement must be against the declarant's interest as defined by the statute. Section 908.045(4). If the statement is one tending to expose the declarant to criminal liability and offered to exculpate the accused, as here, there is a third requirement: the statement is not admissible "unless corroborated." Section 908.045(4).

¶ 59. The circuit court determined that the proffered hearsay did not meet the requirements of § 908.045(4) because it was not sufficiently corroborated. Williams asserts that this was error while the State argues that Williams failed to meet all three requirements.

¶ 60. As previously noted, the admission of evidence is ordinarily a decision left to the discretion of the circuit court. *Ballos,* 230 Wis. 2d at 504. However,

evidentiary determinations involving hearsay frequently implicate questions of both fact and law.

¶ 61. For example, "unavailability" for purposes of the hearsay rules is a mixed question of law and fact. *State v. Buelow,* 122 Wis. 2d 465, 474, 363 N.W.2d 255 (Ct. App. 1984). "When mixed questions are presented, the court must determine two matters: (1) what happened, and (2) whether those facts fulfill a particular legal standard. The second determination is an issue of law." *Id.* at 475 (citations omitted).

¶ 62. Unavailability for purposes of § 908.045(4) is determined by Wis. Stat. § 908.04(1)(e), which requires that the declarant is "absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means." In defining what is required to show efforts to secure the declarant's presence "by process or other reasonable means," this court in *State v. Zellmer,* 100 Wis. 2d 136, 148, 301 N.W.2d 209 (1981), adopted the Judicial Council Committee's interpretation of § 908.04(1)(e). According to that interpretation, the statute requires a "good-faith effort" and "due diligence." *Id.*

¶ 63. In addition, the proponent must "specify the facts showing diligence" and not rely on "a mere assertion or perfunctory showing of some diligence." *Zellmer,* 100 Wis. 2d at 148; *see also La Barge v. State,* 74 Wis. 2d 327, 336, 246 N.W.2d 794 (1976). Thus, the burden to show unavailability is with the proponent of the hearsay.

¶ 64. Williams made limited efforts to locate Winston. There was conflicting information as to whether Winston was from Chicago or lived in Milwaukee. Accordingly, Williams' trial counsel checked with the other defense witnesses to see if they knew where to find Winston. He also checked the Milwaukee and Racine County jails. However, that was the extent of Williams' efforts. The circuit court specifically found that "[t]here's not any indication that any attempt has been made to check any sort of records in Illinois or in Chicago to determine the whereabouts of this person."

¶ 65. The crux of Williams' position is that the reasonable measures he could take to secure Winston's presence were necessarily minimal because he did not know Winston's precise whereabouts. However, this begs the question of whether Williams used due diligence to discover Winston's whereabouts.

¶ 66. Due diligence is not a standard that lends itself well to bright line rules. Nonetheless, given that there was at least some reason to believe that Winston was from Chicago, due diligence required that Williams make at least some minimal attempt to check in Illinois. Because Williams did not establish that he made any such attempts, he failed to carry his burden to establish due diligence.

¶ 67. Even Williams' trial counsel recognized this in attempting to argue in the circuit court that Winston's statement to Shelton was covered by § 908.045(4). After explaining the steps he took to locate Shelton, counsel conceded, "Now I know that's kind of, well, weak when asking for a declarant to be declared unavailable." Subsequently counsel stated: "I think I have the corroboration and I have the statement

128

against interest. I'm frankly most worried about whether I've met the burden to have him declared unavailable."

¶ 68. In short, we determine that Williams failed to meet his burden of showing due diligence, and we agree with the State that he failed to establish that Winston was unavailable for purposes of § 908.045(4). Accordingly, we uphold the circuit court's decision to exclude Winston's statement, although we do so based upon the requirement of unavailability.

¶ 69. Williams also contends that the exclusion of Shelton's testimony violated his right to present a defense. There may be circumstances under which the application of an evidentiary rule impermissibly abridges an accused's right to present a defense. *State v. St. George,* 2002 WI 50, ¶ 51, 252 Wis. 2d 499, 643 N.W.2d 777; *see also State v. Pulizzano,* 155 Wis. 2d 633, 647–48, 456 N.W.2d 325 (1990). Whether the application of the evidentiary rule deprives a defendant of constitutional rights is a question of constitutional fact subject to independent appellate review. *St. George,* 2002 WI 50, ¶ 16.

¶ 70. In *St. George,* this court articulated a two-part framework for analyzing whether the exclusion of expert testimony violates a defendant's right to present a defense. The test is similar to the two-part framework in *Pulizzano* used to analyze whether the exclusion of evidence under the rape shield statute violates a defendant's right to present a defense. At a more general level, the test for whether the exclusion of evidence violates the right to present a defense has been stated as an inquiry into whether the proffered evidence was "essential to" the defense, and whether

without the proffered evidence, the defendant had "no reasonable means of defending his case." *State v. Johnson,* 118 Wis. 2d 472, 480, 348 N.W.2d 196 (Ct. App. 1984).

¶ 71. Williams has not shown that Shelton's statement was essential to his defense or that its exclusion left him with no other reasonable means of defending his case. On the contrary, the jury heard several other pieces of evidence that supported Williams' theory that Winston left behind the jacket with cocaine in it after gambling behind the church.

¶ 72. Williams' brother testified that Winston was also gambling behind the church the day of the offense and that he had the jacket on, but then took it off to shoot craps. Similarly, Shelton testified that he saw "Rob" wearing the jacket. Williams testified that he sold the jacket to Winston earlier in the day before going to gamble. Also, Williams' brother testified that Williams sold the jacket, although he did not witness the sale. Each of three other witnesses, including Shelton, testified that he did not see Williams wearing the jacket. Based on all of this testimony, Williams was able to argue to the jury during closing argument that it was Winston who owned the cocaine and the jacket, which he had left behind at the church when the police showed up.

¶ 73. Considering all of these circumstances, we determine that additional hearsay evidence in the form of testimony by Shelton as to what Winston said was not essential to Williams' defense. Despite the exclusion of this hearsay, Williams had a reasonable means of presenting and arguing his theory. Therefore, his right to present a defense was not violated by the exclusion of that hearsay.

130

¶ 74. Finally, we turn to Williams' assertion that the evidence at trial was insufficient to sustain his conviction for contributing to the delinquency of a child. "[I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). Additionally, we consider the reasonable inferences the jury could make from the evidence presented. *State v. Toliver*, 104 Wis. 2d 289, 296, 311 N.W.2d 591 (1981).

¶ 75. Wisconsin Stat. § 948.40(1), provides: "No person may intentionally encourage or contribute to the delinquency of a child." The standard form jury instruction, identical to the instruction given the jury here, reads in part:

> The first element requires that the defendant intentionally encouraged or contributed to the delinquency of (name of child). This element requires not only that the defendant encouraged or contributed to the delinquency of a child but also that the act or failure to act was done intentionally. The term "intentionally" means that the defendant either had a purpose to encourage or contribute to delinquency or was aware that his conduct was practically certain to cause that result.

> A delinquent child is one who violates any state or federal criminal law.

Wis JI—Criminal 2170 (footnotes omitted).

131

¶ 76. Williams does not dispute that, for purposes of § 948.40(1), James D. was a child and was "delinquent" by engaging in gambling. Instead, Williams asserts that the State presented no proof from which a reasonable jury could conclude that he had the intent necessary under § 948.40(1). We disagree.

¶ 77. Although Williams cites no case law involving sufficiency of the evidence in the context of a conviction for contributing to the delinquency of a child, *Jung v. State,* 55 Wis. 2d 714, 201 N.W.2d 58 (1972), is on point. In *Jung,* this court upheld a guilty verdict for contributing to the delinquency of a minor against a sufficiency of the evidence challenge. The defendant in *Jung* housed a truant and wayward minor and became sexually involved with her after meeting her at a bar. *Id.* at 718–19.

¶ 78. On appeal, the defendant in *Jung* argued that the evidence was insufficient to convict him for contributing to the minor's delinquency because there was no proof before the jury that he knew the minor was wayward or a runaway. 55 Wis. 2d at 721. This court upheld the conviction, concluding that given the circumstances under which the defendant and the girl met, as well as her appearance and the defendant's willingness to let her stay at his house, the jury could reasonably infer the defendant knew she was wayward and truant and that he intentionally contributed to her delinquency. *Id.* at 722.

¶ 79. Juries often must infer intent. *See, e.g., State v. Dix,* 86 Wis. 2d 474, 484, 273 N.W.2d 250 (1979). Intent is by its very nature rarely susceptible to proof by direct evidence. *Clark v. State,* 62 Wis. 2d 194, 197, 214 N.W.2d 450 (1974).

132

¶ 80. As in *Jung,* here the jury had to make reasonable inferences about the defendant's state of mind based on the circumstances. The jury reasonably could infer from the evidence that Williams was aware that his participation in illegal gambling with James D. was "practically certain" to cause James D. to violate the law. Williams points to no evidence in the record that would undermine the reasonableness of such an inference. For these reasons, we determine that the evidence before the jury was sufficient to find him guilty of contributing to the delinquency of a child.

## VI

¶ 81. In sum, we determine that Williams' right to confrontation was not violated when the state crime lab unit leader, rather than the analyst who performed the tests, testified in part based on the crime lab report containing the lab test results. In addition, we determine that the circuit court erroneously admitted the report under the business records exception to the hearsay rule, but that the admission of the report was harmless error in light of the unit leader's testimony and other circumstances. We also reject the other arguments Williams makes in attacking his conviction. Accordingly, we affirm the judgment of the circuit court.

*By the Court.*—The judgment of the circuit court is affirmed.