STATE of Wisconsin,
Plaintiff-Respondent,

v.

Harry L. SEYMER,
Defendant-Appellant.

Court of Appeals

*No. 2004AP552–CR. Submitted on briefs February 2, 2005.—
Decided April 12, 2005.*

2005 WI App 93

(Also reported in 699 N.W.2d 628.)

739

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. CURLEY, J.   Harry L. Seymer appeals the judgment, entered following a court trial, convicting him of first-degree sexual assault of a child, contrary to WIS. STAT. § 948.02(1) (1997–98).[1] He also appeals from the order denying his postconviction motion. Seymer argues that the trial court violated his Sixth Amend-

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

ment right to confrontation when it terminated his cross-examination of the victim, A.S., in his court trial. Because the trial court erred in foreclosing Seymer, then acting *pro se,* from fully cross-examining the victim, A.S., and the error was not harmless, this court reverses the judgment of conviction and remands for a new trial.

## I. Background.

¶ 2.  Seymer was charged on July 24, 2002, with one count of first-degree sexual assault of a child following an investigation triggered by his ex-girlfriend's call to the police. She called after she witnessed inappropriate sexual conduct between her five-year-old daughter and A.S., her twelve-year-old daughter.[2] After the incident, the ex-girlfriend told A.S. to leave the room, but instead, the girl left the house. She was eventually picked up by the police and returned to her home. The police questioned her about her behavior with her sister, and in response to police questions concerning whether anyone had touched A.S. inappropriately, A.S. told the police that while Seymer lived with her family several years earlier, he touched her inappropriately. A.S. was then interviewed by a social worker. According to the criminal complaint, during this videotaped interview, because she was reluctant to talk to a social worker, A.S. wrote down that once, when she was sick and at home alone with Seymer, he would "touch me in places I don't like to be touch[ed]." A.S. was then shown a drawing of a female child, and asked to mark the areas on the drawing where Seymer touched her. She marked the following areas:  cheek, breast, arm, privates, leg, knee, neck,

---

[2] The five-year-old daughter is also Seymer's daughter.

shoulder, back, back of arm, wrist, bottom, and back of leg. The victim indicated to the social worker that Seymer rubbed these areas with his hand on top of and under her pajamas, and that this occurred on several different occasions.

¶ 3. After his arrest, Seymer hired a lawyer and subsequently waived his right to a preliminary hearing. Later, his privately retained attorney asked to withdraw due to Seymer's lack of funds. This request was granted and Seymer was appointed an attorney by the public defender's office. Several months later, Seymer's new attorney asked to withdraw due to the attorney's failing health and Seymer's unhappiness with his representation. This motion was also granted. Seymer was then appointed another attorney by the public defender's office. Shortly thereafter, Seymer sought to represent himself. While the trial court initially denied Seymer's request, on March 17, 2003, the trial court granted Seymer's request to represent himself and Seymer waived his right to a jury trial.

¶ 4. A court trial commenced on April 9, 2003. The State first called the social worker who initially interviewed A.S., and played the videotape of that interview. The State then called A.S. to the stand, only asking her to confirm her name, birth date, and that everything she said or wrote in the videotape was true. Seymer began his cross-examination and asked numerous questions, but his questioning was halted by the trial court. This occurred after the prosecutor objected to a question posed by Seymer. The following exchange explains the trial court's decision:

> THE COURT: Mr. Seymer, where are we going with this?
>
> MR. SEYMER: I – If you want to know where I'm

744

going, in all things she has told me on the telephone before and I was hoping maybe she would finally confess to speaking with me on the phone.

THE COURT: Okay. That's the end of this examination. That's the last of those comments.

Shortly thereafter, the trial court justified its decision:

THE COURT: Mr. Seymer, I gave you several opportunities to understand what I made clear about the way I expected you to comport yourself in the courtroom and you constantly made editorial comments and that last one was the straw that broke the camel's back.

I don't think a witness should be subjected to that. I don't think the Court should be subjected to that and so you're done.

MR. SEYMER: I thought you wanted a truthful answer. I apologize, Your Honor. That's where I was going with that.

THE COURT: You know what, Mr. Seymer, sometimes our feelings about others are truthful and yet decorum requires that we keep them to ourselves.

Certainly when we express those feelings there's a respectful way to express them. You have chosen other ways than respect to express yourself.

This courtroom is a place where I demand that. You lost your privilege to continue that examination because you abused it.

¶ 5.    The State then called A.S.'s mother and, after Seymer requested that portions of a police report containing information transmitted to the police by A.S.'s counselor be admitted, the evidentiary portion of the

745

trial ended. After closing arguments were held, the trial court summarized the evidence and found Seymer guilty of the charge. Sentencing was held approximately one week later. The trial court sentenced Seymer to twelve years' incarceration. Seymer, now represented by a lawyer, brought a postconviction motion seeking a new trial. In a lengthy decision, the trial court denied his request. This appeal follows.

## II. ANALYSIS.

¶ 6. Seymer submits that the trial court violated his constitutional right to confrontation when it terminated his cross-examination of the victim. Seymer claims that his behavior was not so disrespectful or disruptive that it necessitated the extreme measure of terminating his cross-examination, as the trial court later represented, and, as such, the trial court's action was both unreasonable and unnecessary. Seymer argues that even if his cross-examination was, at times, improper, he was given no notice that his conduct would result in the termination of his cross-examination. Finally, he argues that this error was not harmless, as he was prevented from fully exploring the motivations of the victim and testing her credibility and the truth of her allegations. We agree that Seymer's constitutional rights were infringed upon when the trial court prevented him from completing his cross-examination of the victim.

¶ 7. A Wisconsin criminal defendants right to confront witnesses is guaranteed by the Sixth and Fourteenth Amendments to the United States Consti-

746

tution[3] and article I, section 7 of the Wisconsin Constitution.[4] The confrontation rights under both constitutions are the same. *State v. Burns*, 112 Wis. 2d 131, 144, 332 N.W.2d 757 (1983). "The purpose of confrontation and cross-examination is to test both the witnesss memory and credibility in the presence of the fact finder." *State v. Norman*, 2003 WI 72, 36, 262 Wis. 2d 506, 664 N.W.2d 97 (footnote omitted). The right of confrontation includes the right to cross-examine adverse witnesses to expose the witnesss motivation in testifying and any potential bias. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). However, "[i]n the exercise of this right, the accused must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *State v. Smith*, 2002 WI App 118, 6, 254 Wis. 2d 654, 648 N.W.2d 15 (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Moreover, although a court may not prohibit all inquiry into the possibility of bias, reasonable limitation on "interrogation that is repetitive or only marginally relevant" is appropriate. *Van Arsdall*, 475 U.S. at 679. The fundamental inquiry in deciding whether the right of confrontation was violated is whether the defendant had the *opportunity* for effective cross-examination. *See*

---

[3] The Sixth Amendment to the United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Sixth Amendment applies to the states by virtue of the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965).

[4] Article I, section 7 of the Wisconsin Constitution provides in part: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face[.]" Wis. Const. art. I, § 7.

*Delaware v. Fensterer,* 474 U.S. 15, 19–20 (1985) (per curiam); *State v. Pulizzano,* 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990).

¶ 8. Generally, the decision whether to admit or exclude evidence is within the circuit courts discretion. *See State v. Williams,* 2002 WI 58, 7, 253 Wis. 2d 99, 644 N.W.2d 919. However, this discretion may not be exercised until the court has accommodated the defendants right of confrontation. *See State v. St. George,* 2002 WI 50, 16 n.17, 252 Wis. 2d 499, 643 N.W.2d 777. Whether the limitation of cross-examination violates a defendants right of confrontation is a question of law that we review *de novo. See Williams,* 253 Wis. 2d 99, 7.

¶ 9. We first examine the trial court's findings concerning Seymer's conduct.[5] During the trial, the

---

[5] The State maintains that the trial court's "historical facts" cannot be reversed unless they are clearly erroneous. That is generally the proper standard of review. WISCONSIN STAT. § 805.17(2) directs that in court trials:

> (2) EFFECT. In all actions tried upon the facts without a jury . . ., the court shall find the ultimate facts and state separately its conclusions of law thereon. The court shall either file its findings and conclusions prior to or concurrent with rendering judgment, state them orally on the record following the close of evidence or set them forth in an opinion or memorandum of decision filed by the court. . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . . The findings and conclusions or memorandum of decision shall be made as soon as practicable and in no event more than 60 days after the cause has been submitted in final form.

Here, the trial court's findings made following the close of evidence do not mention Seymer's allegedly contumacious conduct. It was only after Seymer moved for a new trial based upon the constitutional violation caused by the abbreviated cross-examination of the star witness that the trial court, some eight

748

trial court sustained several of the prosecutor's objections to Seymer's questions and urged Seymer to ask relevant questions of the witnesses, as his questioning tended to wander off into areas unrelated to the allegations. The trial court also cautioned him against "editorializing." However, despite these problems, nowhere in the transcript does the trial court make mention of Seymer's tone being improper or his questions sarcastic, or advise him that his conduct was egregiously out of bounds.

¶ 10.  After the postconviction motion was heard, the trial court supplemented its terse trial remarks with a fifteen-page decision in which it explained its earlier decision and claimed that Seymer was, among other things:  insolent, disrespectful, flippant, and uncivil. In addition, the trial court wrote that, in its opinion, Seymer had exhibited "derisive behavior," showed "disdain for the prosecution" and "scorn for the rules," used a "mocking tone," "spit back . . . gratuitous comment[s]," "taunted the [court]," and "los[t] his composure." Despite our exhaustive review of the record, we can find little support for the trial court's subjective impressions.[6] Instead, our read of the cold record re-

_____

months later, elaborated on Seymer's conduct. Moreover, the trial court admitted in its postconviction order that it failed to make a record contemporaneously with Seymer's decorum lapses and failed to mention them in his factual findings made at the end of trial. Thus, while we give deference to the trial court's findings made at trial, we do so mindful of this chronology.

[6] We are sympathetic to the problems that unrepresented litigants cause trial courts. However, given the constitutional rights in play during criminal trials, trial judges would be well advised to dig into their reserves of patience and understanding when dealing with *pro se* litigants.

veals an unsophisticated, often awkward, and un-
trained litigant who was attempting, within the context
of a long-standing family dispute, to prove his inno-
cence of a sexual assault charge brought by his ex-
girlfriend's daughter several years after the alleged
events. The record reflects that while Seymer had a
trial strategy and numerous pages of questions to be
asked, his trial skills were poor and time consuming,
and the wording of his questions was often unclear,
sometimes to the point of being incomprehensible. His
demeanor and speech were informal, and he was gen-
erally at a loss to understand courtroom procedure.
However, despite these infirmities, we could glean no
evidence from the record that Seymer exhibited disre-
spect for the court, opposing counsel or the witnesses,
nor did he appear to engage in derisive behavior or
attempt to taunt the judge. On the contrary, the record
is sprinkled with Seymer's numerous apologies to the
court and counsel when his questions were objected to
or when the trial court would chide him to remain on
track. In its order, the trial court complained that
Seymer often repeated the answers given by the wit-
nesses; however, this is a tactic also employed by
neophyte lawyers. Moreover, inasmuch as this was a
court trial and not a jury trial, we think many of these
shortcomings could have been overlooked.

¶ 11.   Our review suggests that early on in the
litigation, problems were brewing between Seymer and
the trial court. At the second motion to withdraw
brought by Seymer's counsel, the following exchange
occurred:

> THE DEFENDANT:   That's why I prepared five
> items of why I wanted him dismissed today. So, I was
> hoping for a chance to talk about it.

THE COURT:  Well, like I said, I can't even – that is a non-starter. It's not your turn. Your turn to present issues while [sic] you are innocent is at trial.

THE DEFENDANT:  No, for dismissal, not for – you said that we weren't going to argue relevancy and you wanted an example. I guess that is where I'm really confused.

THE COURT:  Mr. Seymer, there is no reason to be confused. Listen. Stop looking at the papers you're looking at and look at me. Your reasons for dismissing the case have to do with what the truth of this case is. Judges don't decide that, the jury does. So I can't dismiss the case for those reasons that you give me.

THE DEFENDANT:  How do you know if I haven't read the five reasons to you yet?

[DEFENSE COUNSEL]:  I think he has got five reasons why I should be dismissed.

THE COURT:  Is that what you thought? I thought he meant for dismissal of the case.

. . . .

THE COURT:  If you can state those briefly, I will let you state them.

THE DEFENDANT:  The fact that I thought [first attorney] and I asked for a speedy trial. That is something I hadn't agreed upon and insofar as the three weeks that he's come on with the case wants to push it back.

THE COURT:  I think I've answered that, Mr. Seymer. I already answered that. Mr. Seymer, are you going to let me talk? It's my courtroom.

751

THE DEFENDANT: Oh, well, I thought you said proceed with my reasons.

THE COURT: Okay. I'm done then. I'm not playing a game with you. You ignored what I was saying. Obviously when I start talking after I've given you permission to start is because I have something important to say.

¶ 12. Later, at the beginning of the trial, during Seymer's cross-examination of the social worker, the trial court was offended by one of Seymer's comments:

THE COURT: Is there some factual basis for that in this case?

MR. SEYMER: I'm just – I guess I'm just trying to find out what exactly – some things, too, myself. She's already formed her opinion.

THE COURT: Wait, Mr. Seymer.

MR. SEYMER: No, I – I didn't mean like that. I meant just as far as certain issues dealing with children that she's answered.

THE COURT: You're directing that comment to me or [the witness]?

MR. SEYMER: I meant I – I didn't mean it to be offensive to you, Your Honor.

THE COURT: It certainly came off that way so I'd be more guarded about the things that you say in the midst of a trial.

Thus, it appears that the trial court, for whatever reason, found Seymer exasperating and gave him little leeway during the trial, as we could find almost no other support in the record for the trial court's termination of Seymer's cross-examination. As a result, we find the

underpinnings of the trial court's decision to terminate cross-examination to be unavailing, and Seymer's opportunity for effective cross-examination to have been violated.

■■

¶ 13.  Consequently, we next explore whether the trial court's error was harmless. The test for harmless error is whether it is clear, beyond a reasonable doubt, that a rational fact finder would have found the defendant guilty absent the error. *State v. Harvey*, 2002 WI 93, 49, 254 Wis. 2d 442, 647 N.W.2d 189. The trial court reasoned, in its order denying Seymers request for a new trial, that even if the termination was an error, it was harmless because Seymer failed to show what additional facts he would have presented. We disagree.

¶ 14.  First, we observe that Seymer was under a no contact order with the victim and had no opportunity to question her before or after the trial, so any requirement that he state what additional relevant information may have been elicited during cross-examination was an impossibility. The State concedes that this is not the proper standard. Second, after reviewing the record and the trial courts rationale for its finding of guilt, we are satisfied that the error here was not harmless.

¶ 15.  Although the State charged Seymer with only one count, it was alleged that Seymer molested A.S. on several occasions. During Seymers cross-examination of A.S., she denied any knowledge of the incident with her sister that precipitated her revelation about Seymers assaults, she claimed never to have told the police about being touched inappropriately, and asserted that she never rode in a police car. She could neither remember what time of year it was when she was first touched inappropriately, nor remember

whether the person who touched her wore clothes. In response to many other questions, A.S. simply answered: "I dont know." Even the trial court was apparently unimpressed with the victims testimony. In its decision finding Seymer guilty, the trial court wrote:

> There are other factors that weigh against it. I believe that [A.S.] was evasive on the stand. I think that she told untruths when she said she didnt remember things that I think she could be expected to remember. At the very least that shows that she has a memory lapse and a persons lapse of memory is something that counts against their credibility. But worse than that I think more probable is that there were parts of the truth that she was aware of and was unwilling to discuss and that is evasive.

¶ 16. In its order denying Seymers motion seeking a new trial, the trial court reflected on Seymers cross-examination of A.S. The trial court wrote:

> First I review[ed] the questions Mr. Seymer did ask [A.S.]: He covered a wide variety of subjects and landed hard blows on [A.S.]s credibility. He exposed her bias toward him, her evasiveness, her reluctance to testify to her allegations, the lack of detail in her allegations, the possible bias of [A.S.]s mother, [A.S.]s yearning for attention from her mother, inconsistencies in statements [A.S.] made previously, inconsistencies between her previous statements and her conduct (in particular her willingness to play outside despite her statement that she was afraid to go outside because the defendant might be there) and inconsistencies between her testimony and matters of incontrovertible fact (such as the presence or absence of a television in a certain room at a certain time). I acknowledged these issues in the findings I made at the conclusion of the trial.

¶ 17. Given that Seymers abbreviated cross-examination began to raise serious questions concerning A.S.s credibility and the veracity of her account, we are not convinced that it is clear, beyond a reasonable doubt, that a rational fact-finder would have found Seymer guilty had he been able to complete his cross-examination. In the short cross-examination of A.S., Seymer, in the words of the trial court, "landed hard blows on her credibility." Thus, it is within the realm of reasonable possibility that the completed cross-examination would have produced evidence that seriously undermined the credibility and recollections of the victim, resulting in a not guilty finding. Consequently, having concluded that Seymers right to confrontation was violated and that the error was not harmless, we are obligated to overturn the judgment of conviction and remand this matter for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded.