**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 29, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP1395**

**STATE OF WISCONSIN**

Cir. Ct. No. **2022ME31**

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF A. M. N.:

MARINETTE COUNTY,

    PETITIONER-RESPONDENT,

  V.

A. M. N.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Marinette County: JANE M. SEQUIN, Judge. *Order affirmed; order reversed*.

¶1    GILL, J.[1]    Alex[2] appeals a WIS. STAT. ch. 51 commitment order and an associated order allowing for the involuntary administration of medication.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Alex argues that the circuit court erroneously exercised its discretion by admitting and relying on hearsay evidence regarding the dangerousness element, and that such error is not harmless. Additionally, Alex contends that there was insufficient evidence to support the involuntary medication order because Alex did not receive the required reasonable explanation of the advantages, disadvantages, and alternatives to the proposed medications, as required by WIS. STAT. § 51.61(1)(g)4.

¶2     We assume without deciding that the circuit court erroneously exercised its discretion when it admitted hearsay evidence and subsequently relied, in part, on the hearsay evidence in its findings. Regardless, we conclude that such error was harmless because the court also relied on properly admitted evidence in its findings and that evidence was sufficient to meet the dangerous standard. Therefore, we affirm the commitment order. However, we conclude that the County failed to show that Alex was provided with the explanation required by WIS. STAT. § 51.61(1)(g)4. In doing so, we assume without deciding that Alex's challenge to the involuntary medication order is moot, but we conclude that Alex's appeal presents an "exceptional or compelling circumstance[]" warranting review. Therefore, we reverse the involuntary medication order.

## BACKGROUND

¶3     In April 2022, Alex was exhibiting "extremely paranoid" behavior and reportedly "cutting wires on different appliances" in the home where he lived with his grandparents. He was thereafter detained under WIS. STAT. § 51.15.

---

[2] For ease of reading, we refer to the appellant and his family members in this confidential appeal using pseudonyms, rather than their initials.

¶4     In May 2022, at a final hearing, Dr. Michele Andrade, Dr. Kevin Miller, Deputy David Oginski, and Alex all testified. Oginski testified regarding his contact with Alex's grandfather, Dwayne, and Alex at their home in April 2022. According to Oginski, Dwayne informed Oginski that he was awoken by a loud bang in the basement, which is where Alex's bedroom was located. Dwayne also informed Oginski that "they had previous problems the last couple nights" because Alex had "manipulat[ed] the furnace, water heater, freezer, [and] various electrical appliances down in the basement" by "cutting wires." Alex's lawyer objected to this testimony on hearsay grounds. After counsel explained that she was "not offering this [testimony] for the truth of the matter," the circuit court overruled the objection and allowed the testimony, noting that "it's just for background."

¶5     After Deputy Oginski further testified about Dwayne's concerns regarding Alex, Alex's lawyer renewed his hearsay objection. Again, the circuit court overruled the objection, stating that the challenged testimony was "only allowed for the purpose of laying background." The County then asked Oginski if cutting wires was dangerous, to which Alex's lawyer objected, on grounds of lack of qualification. Oginski stated that "based on [his] training and experience[, he] believe[d] these are things that should not be manipulated or cut by somebody who is not a trained, qualified technician." Oginski further stated that while he did not see who cut the wires, he personally observed that the wires "were cut and manipulated" on the water heater, the furnace, the freezer, and a control panel.

¶6     Doctor Miller testified next. He explained that Alex "elected to remain silent," so his examination was based on "collateral information." The County then asked Miller to give a "brief summary" of Alex's history, "leading up to this incident," to which Miller responded:

> What I understood is that he has previously been treated for psychosis with a diagnosis of schizophrenia and that he was living with his grandparents and that it appeared as though his grandmother was the main one that helped him. She went out of town. He stopped taking medications after she went out of town, and his mental status deteriorated. He started to work on—

At that point, Alex's lawyer objected, asserting a hearsay objection. The County responded that the testimony "can be used because [Miller is] an expert and he can use collateral information to base his opinions that he's going to state today." The circuit court agreed and overruled the objection. Miller then testified that the "information" indicated that Alex had stopped taking his medications as prescribed, that his mental status had "deteriorated," that he believed Alex's diagnosis to be schizophrenia "based on the history and documentation," that the records showed that Alex's "mental status [had] deteriorated," and that Alex was doing unnecessary electrical work in his grandparents' home.

¶7 Doctor Miller noted that it is "a fairly common problem in people with psychosis that they start to believe there's something wrong with the mechanical systems of the home." Explaining further, Miller testified that people who experience psychosis often "start doing electrical work or damaging property in the home" because they "believe there's something wrong" or "something nefarious going on." According to Miller, this behavior can lead to individuals "electrocuting themselves or causing fires in the home," which endangers themselves and others.

¶8 Doctor Miller testified he believed that the applicable dangerousness standard for Alex "was the third standard," under WIS. STAT. § 51.20(1)(a)2.c., and he opined that Alex presented "a significant risk of harm to others and himself." Miller reasoned that this risk was, in part, because Alex was cutting the

wires "in a dangerous way," "such as grabbing bare wires with his hands." Miller also expressed concern that Alex was unqualified to do such work, and that this behavior "didn't just happen once; it happened multiple times" while Dwayne was home.

¶9 Regarding medication, Dr. Miller testified that the records indicated that Alex "had stopped taking his medications as prescribed." Miller opined that Alex was incompetent to refuse medications because he was "not able to understand the risks, benefits, and alternatives to medications."

¶10 Doctor Miller further testified that "[t]he nurse practitioner tried at least twice" to explain the advantages, disadvantages, and alternatives of the medications to Alex. Alex's lawyer objected, and the circuit court overruled the objection, explaining that Miller had reviewed the records from the nurse practitioner.

¶11 Doctor Andrade also testified that she based her findings on "collateral information" because Alex "refused the exam[ination]." Andrade stated that this collateral information included speaking with nursing staff at the Winnebago Mental Health Institute—where Alex was being treated—and Alex's grandparents. According to Andrade, Alex's grandparents confirmed that there was no one in the home, other than Alex, who could have cut the wires. Alex's lawyer objected based on hearsay. The circuit court overruled the objection, stating, "Again, overruled given the fact that this is an expert." Regarding medication, Andrade testified that Alex was not competent to refuse medication, which is the main treatment for schizophrenia.

¶12 Finally, during Alex's testimony, he admitted that he cut the wires. Alex explained that he used the "appropriate safety measures" when cutting the

wires, such as ensuring "that the power was off." Alex also testified that no one explained to him the benefits or disadvantages of the medications recommended for him.

¶13 Thereafter, the circuit court ordered Alex to be committed for six months. In doing so, the court found that the grounds for an initial commitment were established, concluding that Alex was mentally ill, "dangerous based upon the opinions rendered by both Dr. Andrade and Dr. Miller," and a proper subject for treatment. The court specified that Alex exhibited a "substantial probability of physical harm to himself or others, probability of physical harm to others, [and] a substantial probability of physical impairment or injury to himself or other individuals due to impaired judgment." The court also reiterated that "the doctors have the right to rely on collateral sources."

¶14 Regarding involuntary medication, the circuit court noted that "the testimony was clear that the advantages, disadvantages, and alternatives of medication had been explained to" Alex. The court determined that Alex was "not competent" to refuse medication and was "substantially incapable of applying an understanding of [the] advantages, disadvantages, and alternatives" of the medications. The court entered an involuntary medication order for the period of Alex's commitment. Alex now appeals both the initial commitment order and the involuntary medication order. Additional facts will be provided below as necessary.

**DISCUSSION**

## I. Initial Commitment Order

¶15    For an initial commitment, a petitioner must prove by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. WIS. STAT. § 51.20(1)(a)1.-2., (13)(e). "To establish dangerousness, a petitioner in an initial commitment action must prove that the individual meets at least one of four dangerousness standards by evidence of "recent threats," "a recent overt act," "a pattern of recent acts or omissions" or recent behavior.[3]  *See* § 51.20(1)(a)2.a.-d.  The circuit court determined in its written order that Alex met three of the four potentially applicable dangerousness standards.  As previously noted, Alex argues that the court erroneously exercised its discretion by admitting and relying on hearsay evidence regarding the dangerousness element, and that such error is not harmless.[4]

¶16    More specifically, Alex argues that the circuit court "went beyond the properly admitted evidence showing a single episode of conduct and relied on inadmissible hearsay to conclude Alex had engaged in multiple [dangerous] acts" and "posed a substantial risk" to himself or others.[5]  The County responds that while the "court did admit some [hearsay] evidence as background and not for the

---

[3] It is undisputed that the fifth dangerousness standard, which does not require evidence of recent acts or omissions, is inapplicable in Alex's case.  *See* WIS. STAT. § 51.20(1)(a)2.e.

[4] Alex does not challenge the circuit court's finding that he is mentally ill and a proper subject for treatment; his sole challenge relates to the evidence submitted regarding dangerousness.

[5] Alex concedes that there is credible evidence that he cut the wires in his grandparents' home at least once.  In Alex's briefing, he cites to his admission during the final hearing as evidence of this event.

truth of the matter asserted, the … court did not base it[s] final reasoning on hearsay evidence." According to the County, because it presented other evidence that Alex cut wires in the home and engaged in the dangerous acts, the "court's findings … are not clearly erroneous because [the court] did not have to rely on any hearsay."

¶17 For purposes of our review, we assume without deciding that the circuit court erroneously exercised its discretion by admitting and relying on hearsay testimony in finding that Alex was dangerous. However, we conclude that this error was harmless. Harmless error is applicable in WIS. STAT. ch. 51 proceedings. *See* ***S.Y. v. Eau Claire County***, 162 Wis. 2d 320, 324, 469 N.W.2d 836 (1991). An error is harmless when the error did "not affect the substantial rights of the adverse party." WIS. STAT. § 805.18(1). "For an error to affect the substantial rights of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." ***Evelyn C.R. v. Tykila S.***, 2001 WI 110, ¶28, 246 Wis. 2d 1, 629 N.W.2d 768. Whether an error was harmless presents a question of law that we review independently. ***State v. Beamon***, 2013 WI 47, ¶19, 347 Wis. 2d 559, 830 N.W.2d 681.

¶18 In finding dangerousness, the circuit court properly relied in part upon the testimony of Deputy Oginski and Alex's admission that he cut the wires. In doing so, the court noted "the testimony of [Oginski] and of [Alex]" and the "perception of law enforcement" that "the electrical work would result in harm to the subject … and [the] family of the subject." The court found Oginski's personal observations of the cut wires to be credible. This evidence in tandem with Alex's own admission that he cut the wires provided a basis for the court to find dangerousness.

¶19 Despite Alex's testimony that the wires "were not cut with bare hands" and that "the power was off," the circuit court's findings indicate that it did not find this testimony to be credible. In fact, the court stated that "a large part" of its findings were based on the "evidence that's been presented with regard to the cutting of the wires or the pulling of the wires," but the court acknowledged that Alex "disputes that" and claims "that he did do that but that he cut it in a fashion that was safe." Additionally, the court could have relied on Dr. Miller's testimony that people who experience psychosis often "start doing electrical work or damaging property in the home" because they "believe there's something wrong" or "something nefarious going on."

¶20 Alex's testimony was not hearsay and, coupled with Deputy Oginski's testimony that an untrained individual engaged in this activity could harm themselves, provided sufficient evidence from which the circuit court could find Alex dangerous, specifically under WIS. STAT. § 51.20(1)(a)2.c.[6] Stated differently, even without the erroneously admitted hearsay evidence, other properly admitted evidence was sufficient to establish that Alex "[e]vidence[d] such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there [was] a substantial probability of physical impairment or injury to himself … or other individuals." *See* § 51.20(1)(a)2.c. There was credible evidence that Alex demonstrated a pattern of cutting the wires on multiple

---

[6] As noted above, the circuit court concluded that Alex met three of the four dangerousness standards for an initial commitment within WIS. STAT. § 51.20(1)(a)2.a.-d. The County only needed to provide proof of one dangerousness standard to commit Alex. *See* § 51.20(1)(a)2. Because we conclude that Alex met the third dangerousness standard, *see* § 51.20(1)(a)2.c., even without the improperly admitted hearsay evidence, we contain our analysis to that standard. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (holding appellate courts should decide cases on the narrowest possible grounds).

appliances in his grandparents' home. Alex cut the wires for the furnace, the water heater, and the control panel, which were all actions the court reasonably concluded created a substantial probability of physical impairment to himself and Dwayne. Thus, the outcome of the proceeding would be the same even if the court had not considered Dr. Miller's and Dr. Andrade's testimony and reports about Alex's recent dangerous acts of cutting the wires.

## II. Involuntary Medication Order

### A. Mootness

¶21 Alex contends that the County failed to prove that he was given the required reasonable explanation of the advantages, disadvantages, and alternatives to the proposed medications.[7] The County contends that we should not reach the involuntary medication order issue because it is moot under ***Outagamie County v. L.X.D.-O.***, 2023 WI App 17, ¶14, 407 Wis. 2d 441, 991 N.W.2d 518.[8]

¶22 "An issue is moot when its resolution will have no practical effect on the underlying controversy." ***Portage County v. J.W.K.***, 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509. Mootness is an issue that we review de novo. ***L.X.D.-O.***, 407 Wis. 2d 441, ¶11.

---

[7] Alex also argues that the County failed to prove he was not competent to refuse medication. Because we conclude that the County failed to prove that it provided Alex with the required explanation and reverse the involuntary medication order on those grounds, we do not address Alex's argument regarding his competency to refuse medication.

[8] In July 2023, this court ordered supplemental briefing on the issue of whether the involuntary medication order was moot in light of our opinion in ***Outagamie County v. L.X.D.-O.***, 2023 WI App 17, ¶14, 407 Wis. 2d 441, 991 N.W.2d 518.

¶23 This court held in **L.X.D.-O.**, that an involuntary medication order was moot because our review of the merits of that order would not have had a "practical effect" on the collateral consequences (a firearms ban and cost of care liability) because "[t]hose collateral consequences [would] remain in effect under the [undisputedly] valid commitment order regardless of our decision on appeal." *Id.*, ¶¶12, 14; *see* WIS. STAT. § 51.20(13)(cv) (relating to the firearm restriction); WIS. STAT. § 46.10(2) (relating to the cost of care liability). We reasoned that the "there [was] no 'causal relationship' between the medication order *alone* and the collateral consequences stemming from the commitment." **L.X.D.-O.**, 407 Wis. 2d 44, ¶14 (citation omitted). We acknowledged that under § 46.10(2), "an argument could be made that the costs of care may be reduced if a medication order were vacated." **L.X.D.-O.**, 407 Wis. 2d 44, ¶14 n.8. We reserved the cost of care liability issue for another day, however, because the appellant did not make that argument. *Id.*

¶24 Here, Alex adopts the argument from **L.X.D.-O.**'s footnote 8, and he contends that the involuntary medication order is not moot because of the cost of care liability under WIS. STAT. § 46.10(2). We will assume without deciding that the cost of care liability does not save the issue from mootness. Nonetheless, we conclude that Alex's case presents an "exceptional or compelling circumstance[]" warranting review. *See* **L.X.D.-O.**, 407 Wis. 2d 441, ¶15 (citation omitted).

> There are several established exceptions under which this court may elect to address moot issues: (1) "the issues are of great public importance;" (2) "the constitutionality of a statute is involved;" (3) the situation arises so often "a definitive decision is essential to guide the [circuit] courts;" (4) "the issue is likely to arise again and should be resolved by the court to avoid uncertainty;" or (5) the issue is "capable and likely of repetition and yet evades review."

11

*Id.* (citation omitted).

¶25　We conclude that two exceptions to mootness apply to the involuntary medication order: the fourth exception, in which we conclude that our analysis will provide further clarity and resolve uncertainty; and the fifth exception, in which we conclude that the issue is "capable and likely of repetition and yet evades review." Therefore, we choose to address the involuntary medication order.[9]

¶26　Regarding the fourth exception, Alex's challenge to the involuntary medication order is not solely based on the sufficiency of the evidence in this particular case. *See L.X.D.-O.*, 407 Wis. 2d 441, ¶19. Alex's challenge also implicates circumstances regarding a subject's invocation of his or her right to remain silent. "Thus, this appeal will clarify and provide guidance in evaluating sufficiency of the evidence challenges in other cases, [where a subject remains silent] which will be of practical assistance to future litigants." *See id.*

¶27　Addressing the fifth exception, our supreme court has explained that the exception "is limited to situations involving 'a reasonable expectation that the

---

[9] The County's only response to Alex's reliance on these two exceptions is that *L.X.D.-O.* "already addressed" the exceptions and, therefore, Alex's case no longer provides an "exceptional or compelling circumstance[]" warranting review. *See L.X.D.-O.*, 407 Wis. 2d 441, ¶15 (citation omitted). We disagree with the County's argument for two reasons. First, as we will explain, the fifth mootness exception is focused on whether the *same* party will be subject to the *same action*. *See Portage County v. J.W.K.*, 2019 WI 54, ¶30, 386 Wis. 2d 672, 927 N.W.2d 509. Therefore, the fact that *L.X.D.-O.* addressed a similar issue under the fifth mootness exception is irrelevant. Further, *L.X.D.-O.* considered "what circumstances and to what extent an examiner's report may be considered by the circuit court in initial commitment proceedings," *L.X.D.-O.*, 407 Wis. 2d 441, ¶19, not with the circumstances here, which surround the explanation of the advantages, disadvantages, and alternatives to the proposed medications, as required by WIS. STAT. § 51.61(1)(g)4., when a subject elects to remain silent (as we will explain, the facts of this case differ from those presented in *L.X.D.-O.*, 407 Wis. 2d 441, ¶40).

*same* complaining party would be subjected to the *same action* again.'" ***J.W.K.***, 386 Wis. 2d 672, ¶30 (citation omitted). In ***L.X.D.-O.***, we decided to address the involuntary medication order issue, even though the order was moot, because "[t]here [was] ample evidence in the record to suggest that [the subject's] mental health concerns [were] ongoing and that [the subject] may likely be subject to a WIS. STAT. ch. 51 commitment with a medication order again in the future." ***L.X.D.-O.***, 407 Wis. 2d 441, ¶18. Alex could again be subjected to ch. 51 proceedings given his history of mental illness, which includes previous treatment for psychosis and schizophrenia, a history of noncompliance, and evidence that he stopped taking his medications. Thus, as in ***L.X.D.-O.***, "we conclude that the same legal issue will likely arise again specifically for [Alex]." *See **L.X.D.-O.***, 407 Wis. 2d 441, ¶18.

¶28     Additionally, "both in regard to [Alex] as well as similarly situated individuals, given the short duration of commitment orders and the corresponding medication orders … the issue presented by this appeal is likely to evade review because appellate review may not be accomplished before a commitment order expires." *See **id.***; ***J.W.K.***, 386 Wis. 2d 672, ¶29.

¶29     As such, we assume without deciding that Alex's challenge to the involuntary medication order is moot, and we conclude that the fourth and fifth exceptions to mootness apply.

### B. Sufficiency of the evidence

¶30     For a circuit court to order an individual be involuntarily medicated, the petitioner must prove by clear and convincing evidence that the individual: (1) "is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives"; and

(2) "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication or treatment." WIS. STAT. §§ 51.20(13)(e), 51.61(1)(g)4.a.-b. In evaluating whether the petitioner has met its burden, "the circuit court's findings of fact are reviewed for clear error, but application of those facts to the statute and interpretation of the statute are reviewed independently." *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109.

¶31    An individual subject to an involuntary medication order is entitled to an explanation of "the advantages and disadvantages of and alternatives to accepting the particular medication or treatment." WIS. STAT. § 51.61(1)(g)4. This explanation should include why particular medications are "being prescribed, what the advantages of the [medications] are expected to be, what side effects may be anticipated or are possible, and whether there are reasonable alternatives to the prescribed medication." *Outagamie County v. Melanie L.*, 2013 WI 67, ¶67, 349 Wis. 2d 148, 833 N.W.2d 607.

¶32    Alex argues that the County did not provide sufficient evidence that he was given the explanation required by WIS. STAT. § 51.61(1)(g)4. Doctors Miller and Andrade both testified that Alex was unable to apply an understanding of the advantages, disadvantages and alternatives to his recommended medications, and that Alex was incompetent to refuse medication. However, neither doctor provided details regarding the reasoning for their conclusions on the issue. Moreover, the doctors' testimony and their reports state that they did not explain to Alex the advantages, disadvantages and alternatives to the recommended medications. At most, Miller testified that a "nurse practitioner tried at least twice" to provide the required explanation. Miller did not provide

14

any details regarding these attempts, however, and the content and format of these alleged conversations with Alex regarding the explanations are unclear.

¶33 We agree with Alex that the evidence before the circuit court was insufficient to prove he was provided the required explanation. The County did not call the nurse practitioner to testify regarding any attempts to provide the required explanation to Alex, nor did the County introduce into evidence documentation regarding either attempt. The records Dr. Miller relied upon in testifying about the nurse practitioner's attempted explanations were not introduced into evidence. Neither doctor testified or stated in their report that they tried to provide the required explanation. Doctor Andrade testified that she did not know whether "the Winnebago [Mental Health Institute] staff were able to [provide an explanation] or not." It is unclear whether Alex was informed of what medications he was to be prescribed, whether any of the prescribed medications would have side effects, or if there were any alternatives to the medications. *See Melanie L.*, 349 Wis. 2d 148, ¶67. Without evidence that the nurse practitioner tried to provide the required explanation, there was insufficient evidence before the court to warrant an involuntary medication order.

¶34 We recognize that an individual can relinquish his or her right to the statutorily required explanation. *See L.X.D.-O.*, 407 Wis. 2d 441, ¶¶39-40 ("[B]y his own express conduct, [the subject] refused to engage with [a doctor] to receive the full, required explanations. [The subject] cannot now assert that his efforts to avoid the medication discussion should defeat the medication order."); *Waukesha County v. M.J.S.*, No. 2017AP1843, unpublished slip op. ¶29 (WI App Aug. 1, 2018) (holding that an individual "cannot just plug his [or her] ears with his [or her] fingers to avoid hearing the advantages, disadvantages, and alternatives to treatment, and then subsequently complain that he [or she] was not provided the

statutory explanation").[10]  However, unlike **L.X.D.-O.**, there was no admissible evidence provided at the final hearing as to the nature and extent of any attempt to provide Alex with the required explanation.  As stated earlier, experts are allowed to rely on inadmissible evidence in forming their opinions, but they are not allowed to "act as a mere conduit for the opinion of another." **State v. Williams**, 2002 WI 58, ¶19, 253 Wis. 2d 99, 644 N.W.2d 919.  Without the nurse practitioner's testimony or the relevant medical records that Dr. Miller allegedly relied upon, the circuit court could not reasonably assess whether Alex refused an explanation, or whether an explanation simply was not provided to him.

¶35    The County responds that both experts, Dr. Andrade and Dr. Miller, testified that Alex was unable to apply the advantages and disadvantages of, and alternatives to, medication or treatment.  According to the County, the doctors based this testimony "on their review of [Alex's] history of noncompliance."  The County's response is unpersuasive.  There was no foundation for either doctor's opinion on this issue given the fact that neither doctor personally provided the required information to Alex nor attempted to provide the required explanation, and they had no evidence of the nurse practitioner's attempts to do so.  The doctors were unable to assess Alex's ability to understand or apply the advantages, disadvantages and alternatives regarding the medications, and, therefore, their opinions is this regard are without any foundation.

---

[10] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

¶36    We conclude that the County presented no evidence showing that Alex was provided with the explanation required by WIS. STAT. § 51.61(1)(g)4. Therefore, we reverse Alex's involuntary medication order.

*By the Court.*—Order affirmed; order reversed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)4.